UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROSALIE APPEL,<br>    Plaintiff,<br><br>v.<br><br>CHARLES SPIRIDON, et al.,<br>    Defendants. | CIVIL ACTION NO.<br>3:06cv1177 (SRU) |

## RULING AND ORDER

Rosalie Appel is a tenured professor at Western Connecticut State University ("WCSU" or the "University"). In September, Appel was suspended without pay when she refused to undergo a psychiatric examination. Appel has filed suit against four university administrators,[1] pursuant to 42 U.S.C. §§ 1983 and 1988, alleging that their conduct violates the First Amendment and the Equal Protection Clause. She seeks a preliminary injunction to prevent the defendants from requiring that she undergo a psychiatric evaluation in order to maintain her teaching position, salary, and benefits.

With respect to her Equal Protection claim as a "class of one," Appel has established that she will continue to suffer irreparable harm in the absence of an injunction, there are serious questions going to the merits of the case, and the balance of hardships decidedly tips in her favor. *See Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). Accordingly, her motion for a preliminary injunction is granted.

---

[1] Appel has sued the following WCSU administrators: Charles Spiridon, Dean of Human Resources; Linda Vaden-Goad, Dean of the School of Arts and Sciences; Linda Rinker, Provost and Vice President for Academic Affairs; and James Schmotter, President of the University. The defendants have been sued in their individual capacities for compensatory and punitive damages and in both their individual and official capacities for prospective injunctive relief and attorneys' fees. Amend. Compl. at ¶ 4.

**I.     Background**

Appel is a professor of art at WCSU, where she has taught for over forty years. She was granted tenure in 1969. Her main area of expertise is printmaking.

Last year Appel became involved with a colleague's claim of race discrimination. After WCSU failed to consider Hwa Young-Caruso for an open position in the Art Department, Young-Caruso filed a claim with the Connecticut Commission on Human Rights and Opportunities (CHRO). Young-Caruso's claim involved events that occurred during an Art Department meeting in September 2003.

In March 2004, Spiridon and Barbara Barnwell, the University's affirmative action officer, met with Appel to discuss the September 2004 meeting and Young-Caruso's claims of discrimination.

On May 12, 2005, Appel testified at a CHRO hearing on behalf Young-Caruso about what took place during the September 2003 meeting of the Art Department.

Several months later, all the full-time faculty members of the art department, excluding Appel, signed a petition objecting to her behavior. Def. Ex. B. The petition – in the form of a memorandum addressed to Vaden-Goad – described Appel's "unprofessional" conduct as "disruptive and accusatory." *Id.* Appel's colleagues requested outside assistance in order to improve the functioning of their department. *Id.* On October 31, 2005, Appel met with Vaden-Goad to discuss the petition.

On November 11, 2005, pursuant to Article 4.13 of the CSU-AAUP/BOT collective

bargaining agreement,[2] Vaden-Goad convened a special assessment committee ("SAC" or the "Committee") to evaluate Appel's conduct and to develop an action plan to address any problems.  Def. Ex. C.  The Committee was comprised of three faculty members from WCSU, including Professor Katy Wiss, who headed the Committee, as well as the chair of the Art Department at Central Connecticut State University.

As part of its assessment, the SAC reviewed three sets of student evaluations, including two that the Committee distributed; interviewed six graduating senior art majors; twice observed Appel's classroom teaching; interviewed various WCSU faculty and staff members and administrators; reviewed complaints concerning Appel filed by students in recent years; and reviewed documents submitted by Appeal relating to her teaching and professional responsibilities.  Def. Ex. E.  The Committee attempted to meet with Appel and requested written feedback, but she refused to attend a meeting or provide the Committee with written responses.  Def. Ex. F.

The SAC issued a report dated April 28, 2006.  Def. Ex. E.  In that report, the Committee summarized its findings, concluding that, although Appel is capable of teaching well, the Committee has strong reservations about "her ability to develop the rapport appropriate to effective teaching."  *Id.* at 25.  The Committee expressed concern that Appel's behavior may negatively affect individual students.  *Id.*  The SAC also noted its concern regarding Appel's lack of recent creative activity.  *Id.*  Appel's use of e-mail, which the Committee described as "bordering on bullying," *id.* at 19, was a specific behavior that troubled the SAC.  *Id.* at 25.

---

[2] The collective bargaining agreement is between the Connecticut State University American Association of University Professors and the Board of Trustees for the Connecticut State University System.  Def. Ex. A.

Finally, the Committee concluded that "Appel's service is significantly limited by her apparent inability to work with her colleagues." *Id.*

In its report, the SAC set forth several preliminary recommendations. Those recommendations included suggestions for the Art Department as a whole, for colleagues who work with Appel, and for Appel herself. With respect to recommendations directed at Appel and her teaching and work with students, the Committee suggested that she rework her syllabi, establish clear professional boundaries with students, and find accessible space for student exhibitions. *Id*. at 27. With respect to her work with colleagues, the SAC recommended that Appel be given clear instructions on acceptable behavior, and, because the Committee concluded that it was unclear whether she could consistently control her behavior, it recommended that she "be given an in-depth psychological assessment (neuropsychological and projectives battery)." *Id*. at 28. In addition, the SAC suggested that Appel be given the opportunity for medical treatment or psychotherapy to "talk through some of her feelings and concerns." *Id.*

On June 30, 2006, the SAC issued its Plan for Remediation (the "Plan"). Def. Ex. G. The final Plan for Remediation took into account the "rebuttal" and certain materials that Appel provided following the SAC report. *Id.* The SAC identified several areas of remediation and recommended action to respond to those areas. The Committee's recommendations focused on Appel altering her interpersonal behavior with faculty, students, and staff; improving her syllabi, modifying the administration of student surveys, and finding accessible space if she wishes to display her students' work publicly. In addition, the SAC recommended that Appel undergo "neuropsychological and projectives assessments to determine whether she has the capacity to alter the behaviors in this work setting that have been documented as problematic (yelling,

accusing and needing instructions to be repeated many times)." *Id.* In other words, the Committee recommended that Appel undergo a psychiatric examination, at an institution selected by the University's Human Resources Department, because of her "problematic behavior." The schedule recommended by the SAC required Appel to undergo the psychiatric evaluation before the fall 2006 semester. The SAC also recommended that, depending on the results of the psychological testing, the University implement appropriate solutions with medical personnel. Finally, the SAC recommended that Employee Assistance Program ("EAP") support be made available to Appel, and that the University monitor her behavior.

Vaden-Goad sought to meet with Appel in July to discuss the Plan and Appel's compliance with the recommendations. Def. Ex. H. Appel refused to meet with Vaden-Goad that July.

In addition to Appel's Plan for Remediation, the SAC composed general recommendations for the Art Department and for individuals who work with Appel. *Id.* The Committee requested that Vaden-Goad also implement those recommendations, which addressed treating Appel with respect, designing general guidelines for responding to inappropriate behavior, providing a means for students to inform others of a faculty member's inappropriate behavior, generating standards for student surveys and their administration, and retaining syllabi in the Art Department. *Id.*

In a letter dated July 25, 2006, Spiridon wrote Appel, informing her of the necessity to attend the "neuropsychological and projective assessments" at the Institute for Living in order to comply with the Plan for Remediation. Def. Ex. U. Appel refused to attend.

Appel filed the instant lawsuit on July 31, 2006.

On September 5, 2006, Appel met with Spiridon and Rinker, but refused to discuss the Plan for Remediation. Following that meeting, Rinker decided to discipline Appel and informed her that WCSU would be suspending her without pay effective September 14, 2006 because of her failure to undergo the psychological assessment and to cooperate with the Plan for Remediation developed by the SAC. Def. Ex. N.

Because Appel has refused to undergo the psychological evaluation, she has been excluded from teaching and suspended from the University without pay or benefits since September 14, 2006. Although other faculty members have been subject to special assessments, Appel is the only WCSU faculty member who has ever been ordered to undergo a psychiatric examination in order to continue teaching and receiving pay and benefits at the University.[3]

## II.     Discussion

### A.     Standard for Preliminary Injunction

Generally, a party moving for a preliminary injunction must establish: (1) that she will suffer irreparable harm in the absence of an injunction, and (2) either: (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in her favor. *Jolly*, 76 F.3d at 473.[4]

---

[3] Vaden-Goad testified concerning one other faculty member who voluntarily underwent psychological counseling as part of a special assessment plan for remediation. In that case, there were concerns about violence and displays of "extreme anger," including yelling at students and hitting walls.

[4] If the plaintiff challenges "government action taken in the public interest pursuant to a statutory or regulatory scheme, however, [she] cannot resort to the 'fair ground for litigation' standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Jolly*, 76 F.3d at 473. (internal quotation marks and citations omitted). This exception reflects the idea that increased deference is due when governmental policies that have been implemented through legislation or regulations that have been developed through democratic

The defendants have argued that a heightened standard applies because Appel seeks to alter, rather than maintain, the status quo. "The moving party must make a 'clear' or 'substantial' showing of a likelihood of success where . . . the injunction sought will alter, rather than maintain, the status quo – i.e., is properly characterized as a 'mandatory' rather than 'prohibitory' injunction." *Id.* at 473.

The distinction between a mandatory injunction and prohibitory injunction is often ephemeral. *See, e.g.*, *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). The defendants appear to argue that, because Appel is currently suspended, an injunction that would prohibit the defendants from requiring that she submit to an involuntary psychiatric evaluation would change the position of the parties rather than maintain the status quo. In fact, Appel filed her suit and moved for a preliminary injunction before Rinker suspended her without pay. Appel seeks to prevent the University from requiring her to undergo a psychiatric examination; she does not seek to compel the University to change the conditions of her employment or otherwise alter the status quo.

When Appel filed her lawsuit last July, she had been threatened with suspension if she did not submit to the psychiatric evaluation, but Rinker had not yet suspended her. On

---

processes are at issue. *See Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995). The defendants argue that the exception applies in this case because their conduct in convening a special assessment committee and acting on the SAC's recommendations was taken pursuant to the collective bargaining agreement, a contract negotiated and executed pursuant to Conn. Gen. Stat. §§ 5-270 *et seq.* Appel does not challenge, however, the convening of the SAC. Rather, she objects to the specific discipline imposed on her when she refused to submit to the psychiatric examination. The decisions, first, to impose on Appel the requirement that she undergo psychiatric evaluation in order to continue teaching and, second, to suspend her without pay are not "government action taken in the public interest pursuant to a statutory or regulatory scheme." That conduct is action taken against a particular individual apart from the collective bargaining process.

September 9, Appel filed a motion for an injunction in an effort to maintain the status quo and to prevent WCSU from requiring her to undergo the examination. Although Rinker ultimately suspended Appel before the hearing on that motion took place, the injunction sought is best described as prohibitory, not mandatory. Thus, the heightened standard for mandatory injunctions does not apply.

B. <u>Irreparable Harm</u>

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999). Thus, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Reuters v. United Press Int'l*, 903 F.2d 904, 907 (2d Cir. 1990).

To make the required showing of irreparable harm, Appel must establish that she is subject to a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages are inadequate. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).

1. *First Amendment Retaliation*

With respect to her First Amendment claim, Appel has argued that WCSU retaliated against her for: (1) speaking against the University at Young-Caruso's CHRO hearing, and (2) filing the instant lawsuit. "Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction." *Fifth Avenue Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002). There is, however, no presumption of irreparable harm in cases of retaliatory discharge. *See Stewart v. INS*, 762 F.2d

193, 200 (2d Cir. 1985) (noting there is no presumptive chilling effect to satisfy the irreparable harm requirement in every employee discharge case alleging retaliation).

As discussed below, Appel has failed to show a connection between her protected speech and the action taken by the University administrators.  There is no evidence of a violation of Appel's First Amendment rights and no evidence that other employees' speech will be chilled. *Cf., e.g.*, *Holt v. Continental Group, Inc.*, 708 F.2d 87, 91 (2d Cir. 1983) (reasoning that, in cases of retaliatory discharge, risks that other employees may be deterred from protecting their rights or providing testimony may be found to constitute irreparable injury).  Accordingly, Appel has failed to establish irreparable harm with respect to her claim of First Amendment retaliation.

2. *Equal Protection*

With respect to her "class of one" Equal Protection claim, Appel has established irreparable harm.  The defendants argue that the "mere incantation" of an equal protection violation does not constitute irreparable harm.  *See United States v. New York City Bd. of Educ.*, 2002 WL 31663069, *3 (E.D.N.Y. Nov. 26, 2002).  Appel has not merely asserted a violation of her right to equal protection.  As discussed below, she has produced evidence that the defendants are treating her differently from other similarly situated individuals and have no rational basis for doing so.  In other words, she established serious questions going to the merits of her Equal Protection claim.

The violation of a constitutional right is itself irreparable harm.  *See, e.g.*, *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (Eighth Amendment); *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986) (Establishment Clause); *see also* 11A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2948.1, at 161 (2d ed. 1995) ("When

an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

Because Appel has produced evidence of a continuing violation of her right to equal protection, she has satisfied the required showing of irreparable harm to merit a preliminary injunction.

    C.    <u>First Amendment Retaliation</u>

In order to establish a First Amendment claim of retaliation, Appel must establish that: "(1) her speech addressed a matter of public concern, (2) she suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action." *Konits v. Valley Stream Central High School District*, 394 F.3d 121, 124 (2d Cir. 2005).

Appel appears likely to satisfy the first two elements of the retaliation claim.

First, her testimony at Young-Caruso's CHRO hearing did address a matter of public concern. *See id.* at 125 ("we have held repeatedly that when a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern"). The instant lawsuit also addressed a matter of public concern, namely, allegations of retaliation for speaking out against discrimination by the University. *See id.* ("Protection of the courts' interest in candid and truthful testimony, coupled with the rights of discrimination victims to seek protection in legal action, makes testimony or prospective testimony in discrimination suits a matter of particular public interest.").

Second, Appel has suffered adverse employment action, namely unpaid suspension.[5]

---

[5] Appel also appears to argue that the special assessment, including the administration of repeated student surveys, constitutes adverse employment action. The Second Circuit Court of Appeals has defined an adverse employment action as a "materially adverse change" in the terms

Appel has failed, however, to produce any evidence of a causal connection between the speech – either her testimony at the CHRO hearing or the filing of the instant lawsuit – and her suspension.

A plaintiff may prove causal connection in one of three ways: (1) directly through evidence of retaliatory animus, (2) indirectly by showing that the protected activity was followed closely by discriminatory treatment, or (3) through other evidence such as disparate treatment of fellow employees who engaged in similar conduct. *See Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991). Appel has produced no direct evidence of retaliatory animus by any of the defendants nor has she shown that fellow employees, who have filed suit against the University or who have testified regarding claims of discrimination, were treated differently.

Moreover, the members of the SAC, who created the Plan for Remediation and recommended that Appel undergo a psychiatric examination, and Rinker, who ultimately decided to discipline Appel, were unaware of her testimony before the CHRO. The SAC's report and Plan for Remediation were issued before the lawsuit's filing, so it is impossible that the convening of the Committee or the SAC's actions were in retaliation for that speech. Rinker was, however, aware of the lawsuit when she suspended Appel.

With respect to temporal proximity, the Second Circuit Court of Appeals has expressly declined to establish a rule for defining the limits beyond which a temporal relationship is too

---

and conditions of employment. *See Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). A change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to be considered adverse. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Appel's special assessment, including repeated student surveys, is not an adverse change in the terms and conditions of her employment. The special assessment was a form of evaluation and only nominally impacted Appel's teaching when observers visited her classroom and student evaluations were distributed outside her presence.

attenuated to establish a causal relationship between the protected activity and alleged retaliation. *See Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001). "[C]ourts in the Second Circuit have rejected finding a causal inference when there were gaps of three months, six months, eight months, one year, and eleven months between the filing of the complaint and the alleged retaliation." *Johnson v. Connecticut Dept. of Corrections*, 392 F. Supp. 2d 326, 341 (D. Conn. 2005) (citing *White v. Whitman*, 2002 WL 776589, at *12 (S.D.N.Y. Apr. 26, 2002)).

There is a temporal disconnect between Appel's first instance of protected speech and the action taken by the defendants. Young-Caruso's CHRO hearing occurred in May 2005, over one year before Appel was suspended without pay. That time period is too long to establish a causal connection based solely on temporal proximity.

Appel's colleagues submitted their petition to Vaden-Goad on September 1, 2005. Thereafter, a special assessment committee was convened. The SAC's report was issued the following April.

Appel's second instance of protected speech – the filing of the instant lawsuit – occurred on July 31, 2006, six weeks before she was suspended without pay. On the surface, that temporal proximity appears to establish a causal inference between the speech and adverse employment action. Nevertheless, because Appel's suspension was part of a series of actions the defendants took to address her allegedly inappropriate conduct, that proximity does not permit such a causal inference.

Although Appel was not formally disciplined prior to her suspension, the special assessment, SAC's recommendations, and the defendants' implementation of the Plan for

Remediation occurred prior to the filing of her suit. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not raise." *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). Despite Appel's earlier protected activity, which has not been connected in any way to her suspension, the defendants' progressive actions counter any inference arising from the fact that her suspension closely followed the filing of the lawsuit.

Accordingly, Appel has failed to raise serious questions going to the merits of her First Amendment retaliation claim.

D. Equal Protection

Appel's equal protection claim is governed by *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam). Under *Olech*, a plaintiff may bring a successful equal protection claim as a "class of one," when she alleges that: (1) she has been intentionally treated differently from others similarly situated, and (2) there is no rational basis for the difference in treatment. *Id.* at 564; *see also DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003).

1. *Intentional, Different Treatment from Similarly Situated Individuals*

In *Neilson v. D'Angelis*, 409 F.3d 100 (2d Cir. 2005), the Second Circuit Court of Appeals described the standard for the similarly-situated requirement of an equal protection "class of one" claim. The Court described that "stringent standard" and set forth the following test:

> We deem that test to require a plaintiff in such a "class of one" case to show that: (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to

exclude the possibility that the defendant acted on the basis of a mistake.
*Id.* at 105.  In other words, "the standard for determining whether another person's circumstances are similar to the plaintiff's must be . . . whether they are *prima facie* identical."  *Id.* (internal citation and quotations marks omitted).

The relevant circumstances involved here are Appel's status as a tenured faculty member at WCSU who has undergone a special assessment pursuant to the collective bargaining agreement and has been disciplined.  The behavior identified as problematic and meriting a special assessment did not involve violence or threats of violence, but centered around allegedly unprofessional interpersonal conduct.

There was evidence that other WCSU faculty members have been subject to a special assessment, but the University administrators testified that no other faculty member has been subject to an involuntary psychiatric examination as a prerequisite to his or her continued employment.  The only evidence regarding a similar incident was Vaden-Goad's testimony concerning a faculty member who willingly underwent counseling as part of a remediation plan when there were concerns about violence, including episodes of the faculty member yelling at students and hitting walls.

Appel has raised sufficient evidence to establish genuine questions regarding whether the defendants have intentionally treated her differently from similarly situated professors.

      2.    *Absence of Rational Basis*

In addition to showing that she was subject to intentional treatment that was different from that accorded similarly situated individuals, Appel must produce evidence that the disparate treatment was irrational or arbitrary.  *See Hayut v. State University of New York*, 352 F.3d 733,

754 (2d Cir. 2003).

The SAC expressed concerns over the following behavior: yelling, accusing, and needing instructions to be repeated. Wiss also testified that the Committee members were troubled by reports that Appel had difficulty controlling impulses and that others viewed her as "moody, unpleasant, angry." There was no evidence that the SAC or the defendants were concerned about violent behavior or that they considered Appel to be a threat to herself or others.

Additionally, the defendants required that Appel undergo the psychiatric examination immediately after the SAC issued the Plan for Remediation. In other words, Appel was not given the opportunity to modify her behavior independently prior to the University's demand that she submit to a medical evaluation, purportedly aimed at determining whether she has the capacity to change her behavior.

Finally, as noted above, the defendants acknowledged that the University has never demanded a tenured faculty member undergo a battery of psychiatric tests at a facility selected by the Human Resources Department or face suspension without pay.

In the circumstances present here, Appel has raised genuine questions going to the merits of whether the University's treatment of her was as arbitrary or irrational. It is likely that she will establish that the requirement to undergo an involuntary psychiatric evaluation before being given the opportunity to modify the behavior deemed unacceptable – namely, yelling, accusing, and needing instructions to be repeated – is both arbitrary and irrational.

The defendants have pointed to a number of cases in which an employer has legitimately requested a fitness-for-duty psychiatric examination of an employee as legal support for their conduct. *E.g.*, *Graham v. Boehringer Ingelheim Pharmaceuticals, Inc.*, ___ F. Supp. 2d ___,

2006 WL 2563457 (D. Conn. Sept. 6, 2006) (employer required employee to undergo psychological fitness-for-duty evaluation after he made verbal threat to "go postal").

Although the Americans with Disabilities Act ("ADA") generally prohibits inquiring into whether an employee has a disability, it also provides that an employer may require a medical examination that is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A)-(B). The implementing regulations further explain that this provision of the ADA "permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." 29 C.F.R. Part 1630, App. § 1630.14(c). In such cases, the employer must show that the asserted "business necessity" is vital. *Conroy v. New York Dept. of Correctional Services*, 333 F.3d 88, 97 (2d Cir. 2003). "The employer must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary." *Id.* at 98.

Inquiries or examinations may be appropriate and sufficiently narrow in varied circumstances. *E.g.*, *Porter v. United States Alumweld Co.*, 125 F.3d 243, 246 (4th Cir. 1997) (approving of employer's requirement of a medical exam when employee, whose job required lifting, sought to return from leave of absence following back surgery); *Brumley v. Pena*, 62 F.3d 277, 278-79 (8th Cir. 1995) (upholding requirement that employee recovering from depression submit to psychological exam before returning to work); *Rodriguez v. Loctite Puerto Rico, Inc.*, 967 F. Supp. 653, 661 (D.P.R. 1997) (finding no violation of the ADA when employer required an independent medical examination after plaintiff requested two months' leave of absence).

The defendants in this case have not argued, however, that the psychiatric examination

was requested because of a business necessity or that it would be limited to an inquiry concerning Appel's ability "to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). In fact, according to Rinker, she understood that the complete results of Appel's examination, including past mental health history, would be released to the University. Only after questioning by the court regarding privacy concerns, did the defendants clarify that they now only seek a professional medical opinion regarding whether Appel is capable of altering her behavior; they do not seek access to her underlying medical records.

Nevertheless, the defendants have not shown that the medical examination they have required is related to Appel's job functions and would be "no broader or more intrusive than necessary." *Conroy*, 333 F.3d at 98. Moreover, Appel has not filed suit alleging a violation of the ADA. Rather, she claims that, by requiring her to undergo the psychiatric examination or face unpaid suspension, the defendants have violated her right to equal protection; whether the defendants' demand that she undergo a psychological examination violates the ADA or other federal or state law is a separate question.

### III.    Conclusion

Although the evidence on similarly situated individuals was sparse, there was evidence that other WCSU faculty members have been subject to special assessments for problematic behavior. There was, however, no suggestion that Appel's circumstances differed from those other faculty members in a way that would justify her disparate treatment. No other faculty member has been subjected to an involuntary psychiatric examination – an arbitrary and irrational measure for responding to a professor's "yelling, accusing, and needing instructions to be repeated."

There is little question that the balance of hardships tips decidedly in Appel's favor. She is currently barred from teaching, has no access to University services, and is receiving no wages or benefits, including health insurance. The University has other options available to address its issues with Appel's unprofessional conduct, short of requiring a psychiatric examination.

Therefore, Appel's motion for a preliminary injunction (doc. # 10) is GRANTED.

## **PRELIMINARY INJUNCTION**

Rosalie Appel has moved for a preliminary injunction to restrain her employer from requiring her to undergo a mental health evaluation. On November 9, 2006, I conducted a hearing on that motion. At that hearing, Appel established that: (1) in the absence of an injunction she will continue to suffer irreparable harm, namely a violation of her Constitutional right to equal protection, (2) there are serious questions going to the merits of her "class of one" claim because no other faculty member has ever been subjected to an involuntary psychiatric or psychological examination, and (3) the balance of hardships decidedly tips in her favor.

Accordingly, pursuant to Rule 65 of the Federal Rules of Civil Procedure, it is hereby ORDERED that the defendants: James Schmotter, President of Western Connecticut State University; Linda Rinker, Provost and Vice President for Academic Affairs; Linda Vaden-Goad, Dean of the School of Arts and Sciences; and Charles Spiridon, Dean of Human Resources, are hereby restrained, enjoined and prohibited from requiring Appel to submit to any psychiatric or psychological examination or assessment in order to maintain her salary, benefits, and teaching position as a professor of art at the University. The injunction does not affect the other aspects of the Plan for Remediation, described in my ruling.

This order is binding on the four named defendants, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

Appel is not required to give a security pursuant to Rule 65(c).

The preliminary injunction shall remain in effect until a ruling on the merits of Appel's claims or further order of this court.

It is so ordered.

Dated at Bridgeport, Connecticut, this 1st day of December 2006.

/s/ Stefan R. Underhill
    Stefan R. Underhill
    United States District Judge