# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROSALIE APPEL,<br>    Plaintiff,<br><br>    v.<br><br>CHARLES SPIRIDON, et al.,<br>    Defendants. | CIVIL ACTION NO.<br>3:06cv1177 (SRU)<br>3:07cv1237 |

## RULING AND ORDER

Rosalie Appel is a former tenured professor of art at Western Connecticut State

University ("WCSU" or the "University"), where she taught for over forty years.  During the

2004-2005 academic year, Appel supported a colleague's claim of race discrimination in the art

department.  At the start of the following academic year, Appel found herself the subject of a

department-wide petition complaining of Appel's conduct in the workplace.  The University

convened a special assessment committee ("SAC" or the "Committee") to evaluate Appel's

conduct and develop an action plan to address any problems the Committee identified.  On June

30, 2006, the SAC issued its Plan for Remediation (the "Plan").  The final Plan called, in

pertinent part, for Appel to undergo a "neuropsychological and projectives assessments."  On

July 31, 2006, Appel filed an action against four university administrators, pursuant to 42 U.S.C.

§§ 1983 and 1988, alleging that the administrators' conduct violated the First Amendment and

the Equal Protection Clause.[1]  In September 2006, Appel was suspended without pay when she refused to undergo the neuropsychological assessment.  At that time Appel sought a preliminary injunction.  *See* doc. # 10.  I granted the motion on the basis that Appel had raised serious questions concerning the merits of her equal protection claim.  *Appel v. Spiridon*, 463 F. Supp. 2d 255, 261-62, 264-66 (D. Conn. 2006).  The injunction was later vacated after remand from the Second Circuit in light of the Supreme Court's holding in *Engquist v. Or. Dep't of Agric.,* 128 S. Ct. 2146, 2155-57 (2008), that public employees cannot bring Equal Protection claims based on a "class of one" theory.  *Appel v. Spiridon,* 531 F.3d 138 (2d Cir. 2008).

On November 25, 2008, I held a hearing on defendants' motion for summary judgment on the initial complaint.  I granted the motion in favor of all four defendants with respect to Appel's class-of-one claim and in favor of James Schmotter and Linda Rinker with respect to Appel's First Amendment retaliation claim.  Docs. ## 86, 87 at 31.  I denied the motion with respect to Appel's First Amendment retaliation claim against Charles Spiridon and Linda Vaden-Goad.  Doc. # 87 at 31.  I also ordered the case consolidated with a second action filed by Appel concerning additional disciplinary action taken against her since the filing of her claim in 2006.

On June 19, 2009, Appel filed a third-amended consolidated complaint (doc. # 100) against nine university administrators and staff members alleging additional claims of First Amendment retaliation concerning a second CHRO hearing, and the filing of her 2006 lawsuit.[2]

---

[1] Appel initially filed suit against: Charles Spiridon, Dean of Human Resources at the University; Linda Vaden-Goad, Dean of Arts & Sciences at the University; Linda Rinker, Provost and Vice President for Academic Affairs at the University; and James Schmotter, President of the University.

[2] In addition to Rinker, Spiridon, Vaden-Goad and Schmotter, Appel's third amended complaint named as defendants the following University employees: Carole Hawkes, Dean of the School of Visual and

Appel also alleges a substantive due process claim concerning the psychiatric examination. Defendants have moved for summary judgment on the additional allegations. Doc. # 127. For the following reasons, defendants' motion is denied in part and granted in part.

## I.     Standard of Review

 Summary judgment is appropriate when the evidence demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

---

Performing Arts (who replaced Vaden-Goad); Terry Wells, Chair of the Art Department; Margaret Grimes, John Wallace, and Abe Echevarria.

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.     Factual Background

The following facts are undisputed, unless otherwise noted.  All inferences are drawn in favor of Appel, the non-moving party, and any disputes are resolved in her favor.

A.      2004-2006

In 2004, Appel supported a colleague's claim of race discrimination.  After WCSU failed to consider Hwa Young-Caruso for an open position in the Art Department, Young-Caruso filed a claim with the Connecticut Commission on Human Rights and Opportunities (CHRO).  Young-Caruso's claim involved events that occurred during an Art Department meeting in September 2003.  In March 2004, Spiridon and Barbara Barnwell, the University's affirmative action officer, met with Appel to discuss the September 2003 meeting and Young-Caruso's claims of discrimination.

On May 12, 2005, Appel testified at a CHRO hearing on behalf Young-Caruso about what took place during the September 2003 meeting of the Art Department.   Spiridon, Vaden-Goad, and defense counsel Beth Marguiles, attended the CHRO hearing.   Doc. # 127, ex. 20, Spridon Aff. at ¶ 13 and att. A.  Four days later, Appel received a letter from Spiridon concerning her alleged improper handling of acid in the print making lab.  Doc. # 132, ex. H at 38.  Shortly thereafter, the spring semester ended.

At the start of the fall semester the full-time faculty members of the art department, other than Appel, signed a petition dated September 1, 2005 objecting to certain aspects of Appel's behavior.  Doc. # 132, ex. B.   The petition – in the form of a memorandum addressed to Vaden-Goad – described Appel's "unprofessional" conduct as "disruptive and accusatory."  *Id.*  Appel's

colleagues requested outside assistance for the purposes of improving the functioning of their department. *Id.* On October 31, 2005, Vaden-Goad met with Appel to discuss the petition.

On November 11, 2005, pursuant to Article 4.13 of the CSU-AAUP/BOT collective bargaining agreement,[3] Vaden-Goad convened a special assessment committee to evaluate Appel's conduct and to develop an action plan to address any problems. Doc. # 132, ex. C. The Committee was comprised of three faculty members from WCSU, including Professor Katy Wiss, who headed the Committee, as well as the chair of the Art Department at Central Connecticut State University.

As part of its assessment, the SAC reviewed three sets of student evaluations, including two that the Committee distributed; interviewed six graduating senior art majors; twice observed Appel's classroom teaching; interviewed various WCSU faculty, staff members, and administrators; reviewed complaints concerning Appel filed by students in recent years; and reviewed documents submitted by Appeal relating to her teaching and professional responsibilities. The Committee attempted to meet with Appel and requested written feedback, but she refused to attend a meeting or provide the Committee with written responses.

The SAC issued a report dated April 28, 2006. Doc. # 127, ex. 3. In that report, the Committee summarized its findings, concluding that, although Appel is capable of teaching well, the Committee has strong reservations about "her ability to develop the rapport appropriate to effective teaching." *Id.* The Committee expressed concern that Appel's behavior may negatively affect individual students. The SAC also noted its concern regarding Appel's lack of

---

[3] The collective bargaining agreement is between the Connecticut State University American Association of University Professors and the Board of Trustees for the Connecticut State University System.

recent creative activity. Appel's use of e-mail, which the Committee described as "bordering on bullying," was a specific behavior that troubled the SAC. Finally, the Committee concluded that "Appel's service is significantly limited by her apparent inability to work with her colleagues."

In its report, the SAC set forth several preliminary recommendations. Those recommendations included suggestions for the Art Department as a whole, for colleagues who work with Appel, and for Appel herself. With respect to recommendations directed at Appel and her teaching and work with students, the Committee suggested that she rework her syllabi, establish clear professional boundaries with students, and find accessible space for student exhibitions. With respect to her work with colleagues, the SAC recommended that Appel be given clear instructions on acceptable behavior, and, because the Committee concluded that it was unclear whether she could consistently control her behavior, it recommended that she "be given an in-depth psychological assessment (neuropsychological and projectives battery)." The purpose of the exam would be to "determine whether she has the capacity to alter the behaviors that have been documented as being problematic in the work setting. If there are biological or psychological factors which prevent her from performing her duties effectively and consistently appropriate solutions should be discussed." *Id.* In addition, the SAC suggested that Appel be given the opportunity for medical treatment or psychotherapy to "talk through some of her feelings and concerns."

On June 30, 2006, the SAC issued its final Plan for Remediation. Doc. # 127, ex, 3-G. The Plan took into account the "rebuttal" and certain materials that Appel provided following the SAC report. The SAC identified several areas of remediation and recommended action responsive to those areas. The Committee's final recommendations focused on Appel altering

7

her interpersonal behavior with faculty, students, and staff; improving her syllabi, modifying the administration of student surveys, and finding accessible space if she wishes to display her students' work publicly. In addition, the SAC recommended that Appel undergo "neuropsychological and projectives assessments to determine whether she has the capacity to alter the behaviors in this work setting that have been documented as problematic (yelling, accusing and needing instructions to be repeated many times)." In other words, the Committee recommended that Appel undergo a psychiatric examination, at an institution selected by the University's Human Resources Department, because of her "problematic behavior." The schedule recommended by the SAC required Appel to undergo the psychiatric evaluation before the fall 2006 semester. The SAC also recommended that, depending on the results of the psychological testing, the University implement appropriate solutions with medical personnel. Finally, the SAC recommended that Employee Assistance Program ("EAP") support be made immediately available to Appel, and that the University monitor her behavior.

Vaden-Goad sought to meet with Appel in July to discuss the Plan and Appel's compliance with the recommendations. Appel refused to meet with Vaden-Goad at that time.

In addition to Appel's Plan for Remediation, the SAC composed general recommendations for the Art Department and for individuals who work with Appel. The Committee requested that Vaden-Goad also implement those recommendations, which addressed treating Appel with respect, designing general guidelines for responding to inappropriate behavior, providing a means for students to inform others of a faculty member's inappropriate behavior, generating standards for student surveys and their administration, and retaining syllabi in the Art Department.

In a letter dated July 25, 2006, Spiridon wrote Appel and informed her of the necessity to attend the "neuropsychological and projective assessments" at the Institute for Living in order to comply with the Plan for Remediation. Appel refused to attend and Appel filed the instant lawsuit on July 31, 2006.

On September 5, 2006, Appel met with Spiridon and Rinker but refused to discuss the Plan for Remediation. Following that meeting, Rinker decided to discipline Appel and informed her that WCSU would be suspending her without pay effective September 14, 2006 because of her failure to undergo the psychological assessment and to cooperate with the Plan for Remediation developed by the SAC. Rosalie Appel moved for a preliminary injunction to restrain her employer from requiring her to undergo a mental health evaluation.

On November 9, 2006, I conducted a hearing on that motion and subsequently enjoined the defendants from requiring Appel to submit to any psychiatric or psychological examination or assessment in order to maintain her salary, benefits, and teaching position as a professor of art at the University.[4] The injunction, however, did not affect the other aspects of the Plan. The defendants appealed the ruling and moved to stay the injunction pending appeal. I denied the motion to stay on December 21, 2006. Doc. # 51.

B.    2007 to Present

On January 26, 2007, the Second Circuit denied the defendants' motion to stay. *See Appel v. Spiridon,* 06-5723-cv (2d Cir.). On February 2, 2007, Appel attended a meeting with

---

[4] The Second Circuit vacated the order on July 7, 2008 [doc. # 64] because the order granted relief on an equal protection class of one claim brought by a public employee. *See Enquist v. Or. Dep't of Agric.*, 128 S. Ct. 2146 (2008). Neither the preliminary injunction order nor the Second Circuit's decision addressed Appel's substantive due process claim.

Rinker, Spiridon, Carol Hawkes, Dean of Visual Arts, and Terry Wells, Chair of the Art Department, to discuss Appel's return to the classroom.[5] Spiridon memorialized the meeting, noting that Appel's return to teaching was conditioned upon her compliance with the Plan. Doc. # 127, ex. 4, att. C. At that point, the issues between Appel and the University rapidly escalated, as set forth below, and resulted in her eventual termination.[6]

On February 5, 2007, Appel returned to work conditioned on her compliance with the Plan. Upon her return to teaching, four faculty members (Defendants Margaret Grimes, Abe Echevarria, John Wallace, and Terry Wells) making up the Art Department Evaluation Committee began reviewing Appel's performance as set forth in Articles 4.11.6-4.11.9 of the collective bargaining agreement. The first incident following Appel's return to work occurred on February 6, 2007, when Appel contacted the University's Public Safety Department in an effort to have two lab assistants' entry cards to the printmaking lab disabled. The lab assistants had been hired to teach her classes during her absence. Appel was formally reprimanded on March 15, 2007 for attempting to cancel the lab assistants' access to the lab.

The second point of disagreement between Appel and the University concerned her syllabi. The Plan called for Appel to "add to her syllabi clear explanations of course expectations, grading and assignments" and that she "use language that supports student learning and avoid language that may appear to be blaming." Doc. # 127, ex. 3. On February 8, 2007, Wells and Hawkes informed Appel, by letter, of their suggested changes to her syllabi. Doc. #

---

[5] Hawkes replaced Vaden-Goad.

[6] Appel's termination is not at issue in this case.

127, ex 4. att. F. They recommended that Appel: organize the syllabus under headings, include a schedule of class assignments and due dates, a description of the grading policy, and a direction to remove threatening or embarrassing statements such as "rowdy behavior" and "provocations by students." The letter directed Appel to submit revised syllabi by February 20, 2007. Appel submitted revised syllabi, however, on February 22, 2007 Wells and Hawkes sent another letter concerning perceived inadequacies in those revisions. Ten days later, Appel attended a meeting to discuss her syllabi. On March 6, 2007, Hawkes sent Appel a letter purporting to memorialize the March 2, 2007 meeting. Doc. # 127, ex. 4, att. H. The letter indicates that Appel was upset at the presence of Spiridon at the meeting, and that Appel felt the issue of her syllabi was moot because she was using the adjunct's syllabi that had been issued to the class in her absence at the beginning of the semester.

On March 12, 2007, Appel argued with several students in class. The next day the students complained to Wells and Spiridon about Appel's classroom behavior and on March 15, 2007, Appel filed a complaint against each of the involved students. On March 28 and 30, 2007, University Judicial Officer, Charles Alexander, informed Wells that three of the four involved students wanted to transfer out of Appel's class. Rinker sent Appel notice that the school was investigating the students' complaints concerning the March 12, 2007 incident. On April 2, 2007, Appel was informed that the investigation into her claim of student misconduct was complete and there was no probable cause to believe the students violated the school code.

The next incident occurred a few weeks later, on March 28, 2007, when Appel is alleged to have had a verbal altercation with a member of the computer department. On July 9, 2007, the

President's Grievance Committee found that Appel should be suspended for two days without pay for her alleged misconduct.

On April 9, 2007, Appel was notified of a pending charge and sanction concerning certain violations of the Plan. On April 12, 2007, the DEC signed its report (all four members of the DEC were department members who signed the initial petition against Appel). The DEC issued its report and gave Appel an unsatisfactory rating. On May, 1, 2007, Hawkes sent Rinker a memo summarizing the DEC's assessment of Appel. Rinker notified Appel of the report by letter dated May 14, 2007 and offered a time to discuss the evaluation and Appel's failure to comply with the Plan. Two weeks later, a "Step II" hearing concerning the pending charges for violating the Plan was held. On July 9, 2007, the President's Grievance Committee found that Appel should be suspended without pay for one day for violating the Plan.

Rinker sent a follow-up letter dated July 20, 2007, concerning Appel's compliance with the Plan. Rinker's letter stated that Appel would be permitted to teach only one course in the Fall 2007 semester, would be required to enroll in an approved Communications course, and Appel must present her syllabus for the fall semester to Wells no later than August 20, 2007 and a detailed plan concerning her creative activity by September 9, 2007.

On August 15, 2007, Appel filed a second lawsuit alleging First Amendment retaliation arising out of her filing of the 2006 suit and being listed as a witness in Young-Caruso's reopened CHRO fact-finding. On September 5, 2007 Appel attended a meeting with Hawkes, Wells, and Spiridon to discuss Appel's failure to comply with the Plan as set forth in the July 20, 2007 letter. On September 7 and 8, 2007, the University notified Appel of pending charges and sanctions. Four days later, September 11, 2007, Appel relented and asked Rinker to grant a

class override in order for Appel to register for a Communications course as required under the Plan. On September 13, 2007, Wells and Hawkes met with Appel to discuss her creative activity and her syllabi. Appel's relationship with the University deteriorated and on September 17, 2007 she filed a grievance alleging denial of due process. The grievance was denied and after further administrative proceedings, the University terminated Appel on March 14, 2008.

C.        <u>Pending Allegations</u>

Appel alleges that the Special Assessment Committee and review process, including the resulting progressive discipline, imposed by the University constitutes retaliation: (1) for testifying on behalf of a colleague, against WCSU, in a 2005 CHRO hearing; (2) for bringing the instant lawsuit; and (3) because she was identified as a witness in the reopened CHRO fact finding. Appel also alleges that the defendants have engaged in conscious-shocking conduct in violation of the substantive due process clause of the 14th Amendment by ordering Appel to submit to a psychiatric exam and intending to access Appel's mental health record and the results of the exam.

**III.  Discussion**

I previously denied summary judgment on Appel's First Amendment retaliation claim concerning her testimony at the 2005 CHRO hearing. Defendants now move for summary judgment on Appel's substantive due process claim and her First Amendment retaliation claims regarding the filing of her 2006 lawsuit and her being listed as witness for the CHRO's reopened fact finding. Defendants argue that Appel's substantive due process claim fails as a matter of law. They also maintain that Appel's speech is unprotected and that defendants would have implemented the Plan and carried out progressive discipline regardless of Appel's filing the 2006

lawsuit or participating in the reopened fact finding on behalf of Young-Caruso. Defendants further argue that Appel fails to demonstrate a temporal causal link between the alleged retaliation and any protected speech. Because defendants are state actors, defendants claim that qualified immunity provides a bar to claims against them in their individual capacities and that Appel failed to serve them in their official capacities. Each argument is addressed in turn, considering first the merits of Appel's First Amendment and substantive due process claims. *Clue v. Johnson*, 179 F.3d 57, 60 (2d Cir. 1999) ("The Supreme Court has stated an 'unambiguous preference' that we consider the merits first in qualified immunity cases.") (relying on *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)).

A.    First Amendment Retaliation

I previously determined that summary judgment could not enter in favor of Vaden-Goad and Spiridon on the question whether they implemented the Plan, through the SAC, in retaliation for Appel's 2005 CHRO testimony on behalf of Young-Caruso. *See* doc. # 86. Appel must now demonstrate that a reasonable jury could find that enforcement of the Plan throughout 2007 and the resulting progressive discipline is attributable to the filing of her 2006 lawsuit and/or the fact that Young-Caruso asked Appel to testify on Young-Caruso's behalf at the CHRO's re-opened fact finding.

In the Second Circuit, the standard for assessing whether the speech of a public employee is protected from retaliation by the First Amendment is a two-part inquiry. *Anemone v. Metropolitan Transp. Auth.*, --- F.3d ---, 2011 WL 9376 (2d Cir. 2011) (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Appel, a public employee, must first show that she spoke as a citizen on a matter of public concern, that she suffered an adverse employment action, and that a

causal connection existed between the speech and the adverse employment action. *Anemone*, 2011 WL 9376 at *15; *see also Konits v. Valley Stream Central High School District*, 394 F.3d 121, 124 (2d Cir. 2005). The burden then shifts to the defendants to show that they had an "adequate justification for treating the employee different from any other member of the general public." *Anemone*, 2011 WL 9376 at *15 (citing *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti*, 547 U.S. at 418)). Appel alleges two distinct First Amendment claims and I address each in turn.

### 1. Appel's 2006 Civil Action

#### a. Matter of Public Concern

Defendants claim that Appel filed her 2006 lawsuit not to address a matter of public concern, but to seek redress for her own personal situation. "Whether speech by a public employee is protected from retaliation under the First Amendment begins with this question: 'whether the employee spoke as a citizen on a matter of public concern.'" *Garcetti v. Cebalos*, 574 U.S. 410, 418 (2006). An employee who speaks not as a citizen but instead pursuant to her "official duties" cannot invoke the protection of the First Amendment where her employer adversely responds to the speech. *Id.*; *see also Weintraub v. Board of Education*, 593 F.3d 196, 203 (2d Cir. 2010) (holding that the First Amendment did not protect public employee's speech that was "part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher"). Here, the defendants do not contend, nor could they, that the filing of the 2006 lawsuit constitutes speech "part-and-parcel" of Appel's duties as a professor of art. Accordingly, I conclude for purposes of this motion that, in filing her 2006 lawsuit, Appel spoke as a private citizen and not as a public employee.

Next I must consider whether Appel's speech addressed a matter of public concern. *Garcetti*, 574 U.S. at 418. "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999); *see also Huth v. Hasulan,* 598 F.3d 70, 74-75 (2d Cir. 2010). Generally "an employee who complains solely about [the employee's] dissatisfaction with the conditions of [her] own employment is speaking 'upon matters only of personal interest.'" *Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009) (quoting *Connick v. Myers*, 461 U.S. 138 (1983)).

Here, the speech forming the basis of Appel's instant First Amendment claim is her 2006 lawsuit. Appel's 2006 lawsuit concerned, in pertinent part, alleged retaliation against her for testifying about race discrimination at the University on behalf of a co-worker at an administrative proceeding. Race discrimination in a government workplace is a matter of public concern. *Cotarelo v. Village of Sleepy Hollow Police Department*, 460 F.3d 247, 252 (2d Cir. 2006); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003) (holding that racism in the government workplace is a matter of public concern). Testimony before an administrative body on behalf of a co-worker alleging discrimination also addresses a matter of public concern. *Konits*, 394 F.3d at 125 (addressing an issue of first impression and holding that any use of state authority to retaliate against employees who speak out against discrimination in the workplace, including employees identified as witnesses in proceedings addressing discrimination claims, can give rise to a First Amendment claim). Accordingly, as I previously held, Appel's 2005 testimony on behalf of Young-Caruso constituted protected speech because it addressed a matter of public concern, namely the existence of race discrimination at WCSU.

Logic and Second Circuit precedent dictate that a lawsuit predicated on speech about race discrimination within the workplace is itself protected speech on a matter of public concern. *Id.; see also Cotarelo*, 460 F.3d 247. The initial inquiry articulated by the Second Circuit in *Konits* is whether the subject of the initial lawsuit touched upon a public concern. 394 F.3d at 124. In *Konits*, a tenured high school music teacher brought a section 1983 claim against certain school officials alleging First Amendment retaliation for an earlier retaliation lawsuit she filed. 394 F.3d 121. Konits, like Appel, complained of retaliation for assisting a co-worker with a discrimination claim. *Id.* Also like Appel, Konits argued that she was the subject of ongoing retaliation that did not end with the filing of the initial lawsuit but continued until the filing of the second lawsuit. *Id.* The court stated that Konits's prior speech, i.e., her first lawsuit, touched upon a matter of public concern -- discrimination in the workplace -- and therefore the first lawsuit constituted speech on a matter of public concern.

A year after deciding *Konits*, the Second Circuit revisited the issue in *Cotarelo.* Cotarelo, a police officer, brought an action in May 2002 alleging that he was not promoted because, *inter alia*, he had filed a lawsuit in 1999 challenging the department's alleged hostility toward Hispanic police officers. The district court had determined that both the 1999 and 2002 actions concerned "personal grievances relating to plaintiff's own employment interests" and therefore did not constitute protected speech on a matter of public concern. *Id.* at 252. On appeal, the Second Circuit disagreed and stated that "the complaints in the lawsuits concern discrimination problems generally and were not limited to instances affecting only Cotarelo." *Id.* Accordingly, the court held that both of Cotarelo's lawsuits constituted protected speech on a matter of public concern.

With respect to the defendants' argument that Appel's 2006 lawsuit concerns only Appel's personal work performance dispute, defendants properly state that courts in this circuit generally accept that a plaintiff's lawsuit to redress his or her own personal situation, such as dissatisfaction with the conditions of his or her employment, does not constitute a matter of public concern. *Lewis*, 165 F.3d at 164. The Second Circuit, however, recently clarified that "it does not follow that a person *motivated by* a personal grievance cannot be speaking on a matter of public concern." *Sousa*, 578 F.3d at 174. In *Sousa,* the district court granted summary judgment in favor of the defendants after finding the plaintiff's complaints of reverse discrimination, work place violations and hostile work environment constituted statements directed at redressing Sousa's own personal grievances. The Second Circuit reversed. The court, relying on the Supreme Court's holding in *Connick*, directed the district court on remand to consider, when determining whether or not the speech addressed a matter of public concern, the content, form and context of a given statement and be mindful that "while motive may be one factor in making this determination, it is not, standing alone, dispositive or conclusive." *Id.* at 175.

Here, it may be that, at bottom, Appel's motive in initiating an action against the defendants is to resolve her own workplace issues. Nevertheless, Appel's 2006 complaint properly pled a First Amendment retaliation claim predicated on allegations that the defendants targeted Appel for testifying on behalf of a co-worker on the issue of discrimination. Such testimony is protected activity and a matter of public concern. Any lawsuit brought by Appel alleging retaliation for engaging in the protected activity of testifying about discrimination in the workplace also constitutes speech on a matter of public concern. The protected speech at issue

in this case is not Appel's complaints about her own work conditions, even though those work conditions may have motivated her to initiate suit, but speech that served a broader public purpose in that it addressed discrimination at the University. Accordingly, under the holdings of *Konits, Cotarelo* and *Sousa,* Appel spoke as a citizen on a matter of public concern when she filed the 2006 lawsuit against the defendants.

b. Adverse Employment Action

Appel must next show that she suffered an adverse employment action. "[I]n the context of a First Amendment retaliation claim . . . only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnick v. Fashion Institute of Technology*, 464 F.3d 217, 225 (2d Cir. 2006) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)) (internal quotations and alteration omitted). In *Zelnick*, the Second Circuit further instructed that adverse employment actions, in the context of a First Amendment retaliation claim, include: discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. 464 F.3d at 226. The list is not exhaustive and certain "lesser actions" including negative evaluation letters, express accusations of lying, material changes in classroom duties or assignments can also constitute an adverse employment action. *Id.* Whether an employment action qualifies as "'adverse' is a heavily fact-specific, contextual determination." *Id.*

The factual record at summary judgment reveals that Appel suffered the following adverse employment actions. First, six weeks after filing her 2006 lawsuit, Appel was suspended. Second, after the Second Circuit denied the defendants' motion to stay the preliminary injunction, Appel returned to a work environment in which she was subject to

heightened scrutiny and required to perfectly comply with the very Plan she claims was devised out of retaliatory animus for Appel's 2005 CHRO testimony.  In the context of this case and because the Plan by its own terms called for material changes to Appel's autonomy as a teaching professional, the enforcement of the Plan and any resulting discipline for failing to comply could be found to constitute an adverse employment action.  Third, for alleged violations of the Plan, Appel received at least one reprimand and three days' suspension without pay – each constitutes an adverse employment action.  *Zelnick*, 464 F.3d at 226; *see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 203, 223-24 (2d Cir. 2001) (holding that suspension without pay constitutes an adverse employment action).  Furthermore, at the outset of Appel's return to work, her lab access had been limited and her autonomy as the lab supervisor impaired by the presence of lab assistants.  A jury could construe this change in print lab conditions as an act that would objectively deter a professor of art and an artist whose primary expression is print, from exercising her protected speech.  Appel has shown that she suffered numerous adverse employment actions.

### c. Causal Connection

Appel must next present sufficient evidence that a jury could find that a causal connection existed between the filing of her 2006 lawsuit and the adverse employment actions she alleges to have suffered.  A plaintiff may prove a causal connection in one of three ways: (1) directly through evidence of retaliatory animus, (2) indirectly by showing that the protected activity was followed closely by discriminatory treatment, or (3) through other evidence such as disparate treatment of fellow employees who engaged in similar conduct.  *See Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991).  "A plaintiff can establish a causal connection that suggests

retaliation by showing that protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). The causal connection must be sufficient to support the inference that the protected speech was a substantial or motivating factor in the adverse employment action. *Blum v. Schelegal*, 18 F.3d 1005, 1010 (2d Cir. 1994).

Defendants argue that Appel fails to draw a temporal connection between the filing of her 2006 lawsuit and any adverse employment action she suffered. In support of their arguments, defendants cite a number of cases in which courts of various jurisdictions require a "very close" temporal proximity. Defendants, however, overlook established Second Circuit case law that no bright line has been drawn "to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal*, 558 F.3d at 130 (quoting *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir. 2001)). The temporal connection between Appel's filing of her 2006 lawsuit and the adverse employment actions she alleges to have suffered is twofold. First, six weeks after Appel filed her initial action, she was suspended. Second, with regards to defendants' argument that no connection exists between Appel's filing of the lawsuit in 2006 and the progressive discipline imposed in 2007, defendants overlook the fact that it was only upon learning that the Second Circuit denied their request to stay the preliminary injunction, that the defendants undertook zealous enforcement of the Plan with exception of the neuropsychiatric evaluation requirement. There is sufficient evidence for a jury to find a causal connection between Appel's 2006 lawsuit and the adverse employment actions she alleges to have suffered.

d.  Adequate Justification

Although Appel makes out a prima facie case of First Amendment retaliation, the

defendants may be entitled to summary judgment if they demonstrate entitlement to a relevant

defense.  *Anemone*, at * 16.   Here, defendants argue that they would have taken the same actions

against Appel in the absence of the protected speech.  *See Mount Healthy City Sch. Dist. Bd. of*

*Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  In *Anemone*, the Second Circuit stated that

> The constitutional principle at stake [, i.e., freedom from retaliation for protected
> speech,] is sufficiently vindicated if such an employee is placed in no worse a
> position than if he had not engaged in the [protected] conduct.  This principle
> prevents an employee who engages in unprotected conduct from escaping
> discipline for that conduct by the fact that it was related to protected conduct, and
> ensures that an employee who makes an unprotected statement is not immunized
> from discipline by the fact that this statement is surrounded by protected
> statements.  We have noted that although the language in *Mt. Healthy* refers to the
> plaintiff's *conduct,* the [Supreme] Court's analysis, properly understood, attempts
> to weigh the impact of the defendant's *impermissible reason* on the defendant's
> decision to act, such that a defendant can avoid liability by showing that it would
> have taken the same action in the absence of the impermissible reason. The
> burden is on the government to make out the defense.

2011 WL 9376 at * 16 (internal citations and quotations omitted)

The controlling question becomes whether defendants can show indisputably that they

would have taken the same adverse actions, namely implementation and enforcement of the Plan

and the resulting progressive discipline against Appel, even in the absence of her protected

speech.  Not surprisingly, defendants articulate seemingly legitimate reasons for each action

taken against Appel.  *See* doc. # 127 at pp. 19-29.  The flaw with defendants' position, however,

is that it assumes that enforcement and implementation of the SAC's Plan for Remediation is

itself appropriate under the circumstances.  In my previous ruling, I determined that whether the

Plan derived from an ill-will to target Appel for testifying at the 2005 CHRO hearing presents a

genuine issue of material fact. Accordingly, it follows that a genuine issue of material fact necessarily exists concerning the enforcement of the Plan, including any progressive discipline arising out its enforcement.

Furthermore, even though defendants may have taken some action against Appel for isolated conduct, the record can be read as a whole to permit a jury finding that the actions were part of a continuing course of conduct and heightened scrutiny beginning with Appel's 2005 CHRO testimony that continued to snowball with each move Appel made and resulted in the progressive discipline including three days of suspension and the requirement to take a communications course. On this record it cannot be held as a matter of law that the defendants would have taken the 2007 actions against Appel had she not filed the 2006 lawsuit.

### 2. *CHRO's Re-Opened Fact Finding*

#### a. Matter of Public Concern

Appel's identification by Young-Caruso as a potential witness at the CHRO reopened fact finding constitutes speech on a matter of public concern. *Konits*, 394 F.3d at 125 ("[A]ny use of state authority to retaliate against those who speak out against discrimination suffered by others, including witnesses or potential witnesses in proceedings addressing discrimination claims, can give rise to a cause of action under 42 U.S.C. § 1983 and the First Amendment.").

#### b. Adverse Employment Action

The actions taken against Appel in 2007, namely three days' suspension and a material change in her autonomy as a professor of art, constitute adverse employment actions.

#### c. Causal Connection

In order for Appel to demonstrate a causal connection between her agreement to testify on behalf of Young-Caruso and the adverse employment actions against her, she must show that the defendants knew of her willingness to testify. Any actions taken before defendants learned about her possible testimony cannot have been caused by plaintiff's speech. Here, Appel attempts to rely on a temporal link between her speech and the adverse employment actions without any evidence about when defendants learned of her speech. At summary judgment the mere suggestion of a temporal link without evidence that any one of the defendants knew of Young-Caruso's request is too attenuated to establish a causal relationship between the protected activity and alleged retaliation. *See Gorman-Bakos*, 252 F.3d at 554. Appel, to survive summary judgment on the claim, needed to show at least some temporal proximity between Young-Caruso's request and any action taken against Appel by the University. Appel's testimony that at an unspecified time during the relevant period Young-Caruso reached out to her, without more, is plainly insufficient. Accordingly, defendants' motion for summary judgment on Appel's First Amendment retaliation claim premised on Appel being identified as a potential witness at the reopened CHRO fact finding is granted.

### 3. *Personal Involvement and Qualified Immunity*

I previously held on summary judgment that Appel's First Amendment claim concerning her CHRO testimony would proceed against only Vaden-Goad and Spiridon. The question now becomes whether Appel's instant First Amendment retaliation claim proceeds against Rinker, Spiridon, Hawkes, Wells, Grimes, Wallace, Echevarria and Schmotter. In the Second Circuit, personal involvement of the defendants in the alleged First Amendment retaliation is a prerequisite to an award of damages under section 1983. *Scott v. Fisher,* 616 F.3d 100, 110 (2d

Cir. 2010) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert denied,* 434 U.S. 1087 (1978)).  If personal involvement is shown, a government official may still avoid liability and is entitled to a defense of qualified immunity where the official performs discretionary functions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Pearson v. Callhan*, 555 U.S. 223 (2009).  The qualified immunity analysis at summary judgment is a two-step inquiry.  *Id.* at 230-31; *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010).  The inquiry is not sequential and requires that I consider whether the facts shown demonstrate a violation of a constitutional right and whether the identified right was clearly established at the time of the alleged misconduct.  *Pearson*, 555 U.S. at 230-31; *Taravella*, 599 F.3d at 133.

First, with respect to Rinker, the facts concerning Appel's 2006 lawsuit reveal that Rinker was responsible for disciplining Appel throughout 2007 and that Rinker played the leading role in the enforcement of the Plan.  *See* Ex. 18.  Indeed, each of the other defendants acted on her orders.  *See* doc. # 127 at 31.  Rinker maintains that she merely enforced the SAC's Plan, but the validity of the Plan is already at issue.  Furthermore, although Rinker argues that legitimate grounds existed for each action taken against Appel in 2007, the record equally supports a finding that enforcement of the Plan and the resulting discipline arose out of a retaliatory animus that can be traced back to Appel's initial CHRO testimony and the filing of her 2006 lawsuit.  At the time the facts giving rise to this claim occurred, it was established law in this Circuit that a lawsuit alleging race discrimination was protected speech.  *Konits*, 394 F.3d 121.  Rinker fails to come forth with any evidence in the record that Appel's speech, namely the filing of her 2006 lawsuit was so disruptive to the effective and efficient operation of the WCSU Art Department

that a reasonable and prudent person could not have anticipated that disciplining her would violate her First Amendment rights. *DiMarco v. Rome Hosp. and Murphy Memorial Hosp.,* 952 F.2d 661, 666 (2d Cir. 1992). Rinker knew of Appel's 2006 lawsuit and there remains a genuine issue of material fact whether Rinker took Appel's protected speech into consideration in imposing discipline against her. Accordingly, genuine issues of material fact preclude summary judgment on qualified immunity grounds in favor of Rinker with respect to Appel's First Amendment retaliation claim. *See Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003).

Defendants maintain that Spiridon's conduct did not result in an adverse action taken against Appel in 2007. The record, however, shows that Spiridon was part of the grievance committee that approved Appel's suspensions and that he was well aware of Appel's 2006 lawsuit and the facts giving rise to that suit. Accordingly, a jury could find, for substantially the same reasons as Rinker, that Spiridon took part in the adverse employment actions against Appel in 2007 and that Spiridon was motivated by a desire to punish Appel for the filing of her 2006 action.

The remaining defendants each argue their entitlement to qualified immunity on the basis of lack of personal involvement and/or each merely followed Rinker's orders. In the Second Circuit, personal involvement of the defendants in the alleged First Amendment retaliation is a prerequisite to an award of damages under section 1983. *Scott v. Fisher,* 616 F.3d 100, 110 (2d Cir. 2010) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert denied,* 434 U.S. 1087 (1978)). Following a supervisor's orders does not alone entitle a defendant to qualified immunity, *Raysor v. Port Authority of New York & New Jersey,* 768 F.2d 34, 38 (2d

Cir. 1985), *cert. denied,* 475 U.S. 1027 (1986); however, where a defendant lacks authority to issue or stop the adverse employment action he cannot be considered to have retaliated against the plaintiff and is therefore entitled to qualified immunity. *Deters v. Lafuente*, 368 F.3d 185, 189-90 (2d Cir. 2004).

In her role as the Dean of the School of Visual and Performing Arts, Hawkes engaged in the following actions against Appel during the 2007 period. Hawkes met with Appel along with Rinker, Wells and Spiridon to review the Plan and Appel's return to work. Hawkes played a critical role in the syllabi issue and in monitoring Appel's compliance with the Plan, and she reviewed the DEC. The evidence at summary judgment indicates that Hawkes acted on Rinker's orders to enforce the terms of the Plan and there is no evidence that Hawkes knew of Appel's 2006 lawsuit. *See* Ex. 9. Retaliatory intent is an element of a First Amendment retaliation claim. Appel, at summary judgment, needed to present evidence raising a genuine issue concerning whether Appel's 2006 lawsuit was a motivating factor for Hawkes's decision to enforce compliance with the Plan. Appel failed to do so. Accordingly, Hawkes is entitled to qualified immunity with respect to Appel's First Amendment retaliation claim. *Deters*, 368 F.3d at 189.

In his capacity as Chair of the Art Department, Terry Wells played a role in enforcing the terms of the Plan after Appel's return to work in 2007. The incidents in which Wells, also a member of the DEC, directly participated included the lab assistant card access issue, and the syllabi issue. Like Hawkes, Wells was acting on orders from Rinker and carrying out his duties as Chair in enforcing the Plan and was unaware of Appel's 2006 lawsuit. Wells is entitled to

qualified immunity with respect to Appel's First Amendment claim for substantially the same reasons as Hawkes.

With respect to defendants Grimes, Wallace, and Echevarria, each was assigned to the DEC and lacked any knowledge of Appel's 2006 lawsuit. Accordingly, for the same reasons, there is simply no evidence in the record that any of these defendants retaliated against Appel and each is entitled to qualified immunity.

President Schmotter, a defendant in the 2006 lawsuit, knew of Appel's protected speech. There is nothing in the record, however, connecting Schmotter to the acts taken against Appel in 2007. Schmotter's knowledge of Appel's protected speech, without evidence of an affirmative act against Appel on his part, cannot give rise to liability. *See generally Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Accordingly, Appel has failed to demonstrate that Schmotter was personally involved in the acts taken against her. *See generally Scott,* 616 F.3d 100.

In sum, Hawkes, Wells, Grimes, Wallace, Echevarri are entitled to qualified immunity on Appel's First Amendment retaliation claim. Schmotter is entitled to summary judgment on the claim because the record lacks evidence of his personal involvement in the actions taken against Appel. Rinker and Spiridon's motion for summary judgment on the issue of qualified immunity with respect to Appel's First Amendment retaliation claim is denied.

B.    Substantive Due Process Claim

Appel also brings a substantive due process claim alleging that the defendants violated her right to privacy when they ordered her to submit to a neuropsychological exam and projectives battery and intended to access to the results of those exams. An individual's right to privacy is protected by the Due Process Clause of the Fourteenth Amendment. *O'Connor v.*

*Pierson*, 426 F.3d 187 (2d Cir. 2005) (citing *Whalen v. Roe,* 429 U.S. 589, 598-600 & 598 nn.23,

97 (1977)). The privacy right encompasses the right to hold confidential certain information

about oneself. *O'Connor*, 426 F.3d at 201. For Appel to prove that the defendants violated her

right to substantive due process under the Fourteenth Amendment to the Constitution of the

United States, she must show "'conscience-shocking' exercises of power by government actors."

*Johnson v. Newburgh Enlarged School District*, 239 F.3d 246, 252 (2d Cir. 2001); *see also*

*Burns v. Cook*, 458 F. Supp. 2d 29, 42 (N.D.N.Y. 2006) ("Whether defendants' conduct

constitutes arbitrary, egregious, and otherwise conscience-shocking conduct depends on

defendants' states of mind when they engaged in such conduct. . . . For example, if the alleged

conduct was motivated by spite and served no rational governmental purpose it would fall within

that category of conduct against which the substantive due process doctrine protects. . . . On the

other hand, if the conduct was well-intentioned or merely negligent, substantive due process

would not apply. To state a substantive due process claim, a plaintiff must also allege that the

governmental conduct deprived her of a protected right. One such protected right is the

individual right to privacy, which includes the right to confidentiality.").

    The Second Circuit has determined that violating or intending to violate the privacy of an

employee's medical records, especially her mental health records, violates the Fourteenth

Amendment right to substantive due process where the defendants' intent was to injure or to

spite the plaintiff. *O'Connor,* 426 F.3d 187. The facts of *O'Connor* are highly instructive and

involve a strikingly similar situation to Appel's: a teacher (O'Connor), with a history of difficult

behavior as evidenced by students' and colleagues' feedback, is disciplined and ordered to

undergo a mental examination; at first the employer expresses a desire to access the results of

that exam and later retracts its request. *Id.* at 201-04. First, the *O'Connor* court took issue, not

with the employer's requirement that the employee submit to a fitness for duty examination, but

that the employer desired to access the results of that examination to make its own independent

medical assessment. *Id.* at 201. The court then held that a substantive due process claim could

survive summary judgment on the basis that the plaintiff's privacy interest was violated when

school officials ordered his medical records disclosed if the school board's interest did not

outweigh the burdened privacy right. *Id.* at 202-03. In order to determine whether the board's

interest outweighed O'Connor's privacy interest, the court held that O'Connor needed to show

that the action was "arbitrary in a constitutional sense" and was conduct that "shocks the

conscience." *Id.* at 203 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998);

*Collins v. City of Harker Heights*, 503 U.S. 115, 118 (1992)). Next, the court concluded that,

because reasonable inferences drawn in the plaintiff's favor cast doubt upon the motivation

behind defendants' request to access plaintiff's mental health records (i.e, was the board simply

mistaken about its right to access the records, or was it driven by a desire to injure or to spite

O'Connor), summary judgment on the substantive due process claim was inappropriate. *Id.* at

203-04.

      The facts concerning Appel's substantive due process claim demonstrate the following.

On June 30, 2006, the SAC issued its final plan. The Plan called for Appel to undergo

"neuropsychological and projectives assessments to determine whether she has the capacity to

alter the behaviors in this work setting that have been documented as problematic (yelling,

accusing and needing instructions to be repeated many times)." Doc. # 127, ex. 3-G. In other

words, the Committee recommended that Appel undergo a psychiatric examination, at an

institution selected by the University's Human Resources Department, because of her

"problematic behavior." The schedule recommended by the SAC required Appel to undergo the

psychiatric evaluation before the Fall 2006 semester. The SAC also recommended that, "if there

are biological or psychological factors which prevent Professor Appel from performing her

duties effectively and consistently that appropriate solutions be discussed and implemented with

proper medical personnel so that Professor Appel may do her job effectively." *Id.* The report

also suggested that Appel be offered EAP support for any "emotional stress or anxiety." *Id.*

Spiridon subsequently scheduled an appointment for Appel with the Institute for Living. Appel

never attended that appointment, instead she initiated suit and moved for a preliminary injunction

barring the defendants from forcing her to undergo testing. I granted the preliminary injunction.

On November 9, 2006, I held a hearing on Appel's motion for a preliminary injunction.

Certain defendants' testimony at that hearing suggested that, at least when Appel was ordered to

undergo psychological testing, the defendants expected to obtain her medical records including

her mental health history. *See* Transcript of Nov. 9, 2006 Hr'g (hereafter "Trans."). Appel also

testified that she believed she would be required to disclose those results. Trans. p. 22, ln. 22 - p.

23, ln. 1-2. Linda Rinker testified that, when she was involved in similar discipline once in the

past, including "a psychiatrist to do an assessment for the University, . . . both parties . . . were

given the information, both the individual and the university." She assumed that would happen

in Appel's case as well, including "a complete review of any psychiatric history that Ms. Appel

had in the past" *Id.* at p. 65, ln. 17 - p. 66, ln. 12. Vaden-Goad testified that in one instance in

the past an employee's mental health information may have been disclosed, and at the least

indicated that Appel's might have been as well, although "I believe there's some difference

between whether [the mental health examination is] mandated or whether it's voluntary and I believe Human Resources can answer that more fully." *Id.* at p. 84, ln. 24 - p. 85, ln. 8. Vaden-Goad also indicated that she believed she could have struck the mental health exam from the university's disciplinary plan, although she did not. *Id.* at p. 91, ln. 2-4. Although other faculty members have been subject to special assessments, Appel is the only WCSU faculty member who has ever been ordered to undergo a psychiatric examination in order to continue teaching and receiving pay and benefits at the University.[7] Rinker testified at the preliminary injunction hearing that the University assumed and intended it would have access to Appel's psychiatric evaluation, including a "complete review of any psychiatric history that Ms. Appel had in the past." Ex. H at p. 66.

Notably, before lunch during the November 9, 2006 preliminary injunction hearing, defense counsel discussed the University's interest in receiving the results of Appel's psychological examination. *Id.* at p. 93, ln. 7-16. After lunch, during which time defense counsel read the *O'Connor* decision discussed above, defense counsel indicated that the defendants had no interest in receiving Appel's medical records. *Id.* at p. 93, ln. 3-17. That change of position during the preliminary injunction hearing, like the defendants' change in position in *O'Connor,* has no bearing on the issue of intent and raises itself a question of fact for the jury whether the defendants intended to access Appel's medical records. At bottom, the key question here concerns the defendants' belief and intent when requiring Appel to undergo a

---

[7] Vaden-Goad testified concerning one other faculty member who voluntarily underwent psychological counseling as part of a special assessment plan for remediation. In that case, there were concerns about violence and displays of "extreme anger," including yelling at students and hitting walls.

mental health exam, not their later decision and representation not to seek mental health records and exam results.

Here, as in *O'Connor*, there is a genuine issue of material fact whether the defendants sought access to Appel's mental health records and exam results out of a mistaken belief that they were entitled to them as a means of assessing her ability to continue in her duties, or whether the defendants were seeking ways to discredit and injure Appel. Indeed, a jury could certainly find that requiring Appel to undergo a psychiatric exam and to release her mental health records and exams was a decision made out of spite or some other ill-will and is conscious-shocking. *O'Connor,* 426 F.3d at 203-04. Because the defendants' state of mind is likely the difference between a successful claim and one that fails, the merits of the substantive due process claims must be decided by a jury, not the court. *Id.* at 203 ("[W]e do not believe that whether the Board's actions were conscience-shocking can be decided at the summary judgment stage. The primary issue is the state of mind [of the defendants]."). The defendants' motion for summary judgment with respect to Appel's substantive due process claim is denied.

### 1. *Qualified Immunity & Certain Defendants' Involvement*

The defendants argue that qualified immunity is appropriate with respect to Vaden-Goad and Spiridon for lack of personal involvement and with respect to all defendants because the right at issue was not clearly established.[8] As previously noted, personal involvement of the defendants in the alleged substantive due process violation is a prerequisite to an award of

---

[8] Rinker does not move for qualified immunity on the basis of lack of personal involvement.

damages under section 1983.[9]  *Scott,* 616 F.3d at 110.  However, the mere following of Rinker's

orders does not entitle the defendants to qualified immunity.  *See Raysor,* 768 F.2d at 38.

Spiridon and Vaden-Goad argue that evidence does not exist that would support a finding that

each was sufficiently personally involved in the ordering of the mental health examination of

Appel to be liable on the claim.  Testimony from the November 2006 hearing, however, raises

questions about the extent of their involvement.  Spiridon scheduled Appel's psychological

evaluation and ordered Appel to submit to the evaluation.  Trans. at p. 18, ln. 20-25; p. 99, ln. 6-

23.  He also placed a copy of the SAC's special assessment report in Appel's file.  *Id.* at p. 99,

ln. 1-3.  Vaden-Goad invoked the special assessment process and decided who should be on the

SAC.  *Id.* at p. 77, ln. 19-20.  Vaden-Goad "was to get together with Professor Appel to discuss

and create a way of complying with the recommendations of the committee."  *Id.* at p. 80, ln. 22-

24.  In other words, it was not up to the SAC to implement their recommendations, but rather "it

was up to Dean Vaden-Goad and others to decide . . . what to do with the information [the SAC]

we came up with."  *Id.* at p. 142, ln. 17 - p. 143, ln. 1 (testimony from chair of SAC).  Because

Vaden-Goad was in charge of implementing any discipline that Appel would receive, including

the requirement of a mental health evaluation, there exist genuine issues of material fact

concerning what she intended with regard to the results of that evaluation.  Accordingly,

qualified immunity on the basis of lack of personal involvement is denied with respect to Vaden-

Goad and Spiridon.

---

[9] There exists no evidence in the record connecting Wells, Wallace, Grimes, Echevarria, or Schmotter to
the issue of the mental health evaluation.  Accordingly, to the extent that Appel included those defendants
in her substantive due process claim, it necessarily fails against them.

Defendants are correct that a government official is entitled to a defense of qualified immunity where the official performs discretionary functions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson*, 555 U.S. at 231-32. As discussed *infra* section A.3, the qualified immunity analysis at summary judgment is a two-step inquiry that is not sequential and requires that I consider whether the facts shown demonstrate a violation of a constitutional right and whether the identified right was clearly established at the time of the alleged misconduct. *Pearson*, 129 S. Ct. at 815-16. The facts in the record permit a finding of a violation of Appel's Fourteenth Amendment right to privacy. The remaining issue therefore is whether that right was clearly established at the time the defendants are alleged to have sought her mental health records. A right is clearly established if the law is defined with reasonable clarity, the Supreme Court or Second Circuit has recognized the right, and a reasonable person could have understood from that law that his conduct was unlawful. *See Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003). The Second Circuit's *O'Connor* decision was decided on October 11, 2005 and makes plain that it can be a violation of one's substantive due process right to privacy to compel the production of medical records on the basis of ill-will. *O'Connor*, 426 F.3d 187. Accordingly, approximately nine months before the SAC issued the final Plan (and exactly one month before Vaden-Goad provided Appel notice of the SAC, *see* doc. # 132, ex C), the defendants were on notice that intending to access Appel's mental health medical records and exams could give rise to liability. Rinker, Spiridon and Vaden-Goad are not entitled to qualified immunity with respect to Appel's substantive due process claim; their claim that the law was not clearly established is mistaken.

C.    Conspiracy[10]

Appel also alleges that each of the defendants acted jointly and in concert with each other to violate her First and Fourteenth Amendment rights.  Defendants argue that Appel's conspiracy claim is barred by the intracorporate conspiracy doctrine.  The intracorporate conspiracy doctrine precludes a claim of conspiracy where the individual defendants are also employees of an institutional defendant.  *Nat'l Congress for Puerto Rican Rights v. City of New York,* 75 F. Supp. 2d 154, 168-69 (S.D.N.Y. 1999).  Under the doctrine, officers, agents, and employees of a single institutional entity are legally incapable of conspiring together.  *Nassau County Employee "L" v. County of Nassau,* 345 F. Supp. 2d 293, 304-05 (E.D.N.Y. 2004).  The doctrine is applicable where the officers, agents, and employees are alleged to be acting within the scope of their employment.  *Id.* at 304.

Appel counters that the Second Circuit has not explicitly held that the doctrine applies to section 1983 claims.  Numerous district courts of this circuit, however, have consistently determined that the doctrine applies to section 1983 claims.  *See Anemone v. Metropolitan Transp. Authority,* 419 F. Supp. 2d 602, 603-04 (S.D.N.Y. 2006); *Jessamy v. City of New Rochell,* 292 F. Supp. 2d 498, 514 (S.D.N.Y. 2003); *Jackson v. New York,* 381 F. Supp. 2d 80, 90-91 (N.D.N.Y. 2005); *Kamara v. City of New York,* No. 03 Civ. 0337(CPS), 2005 WL 3113423, at *7 (E.D.N.Y. Nov. 21, 2005); *Nassau County Employee "L",* 345 F. Supp. 2d at

---

[10] In Appel's initial complaint she alleged conspiracy to violate her Constitutional rights.  Doc. # 1 at ¶6. Defendants did not move for summary judgment on that claim.  Doc. # 70.  Defendants now move for summary judgment on the conspiracy claim as alleged in the third amendment complaint.  Accordingly, I consider that claim as it applies to both of Appel's First Amendment claims as well as her substantive due process claim.

304-05; *Nat'l Congress for Puerto Rican Rights,* 75 F. Supp. 2d at 168-69. Accordingly, I hold that, in the absence of controlling contrary authority, the intracorporate conspiracy doctrine applies to section 1983 claims. 419 F. Supp. 2d at 603-04.

A conspiracy claim under section 1983 requires an agreement between two or more actors to act in concert to inflict an unconstitutional injury and that an over act in furtherance of the goal caused damages. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). At the outset, the conspiracy claim against Wells, Wallace, Grimes, Echevarria and Schmotter is dismissed because each is entitled to qualified immunity for lack of personal involvement in both of Appel's constitutional claims. With respect to Rinker, any allegation that she participated in a conspiracy to retaliate against Appel for Appel's 2005 CHRO testimony fails as I have already determined that Rinker is entitled to qualified immunity on that claim. However, turning to the conduct of Rinker, Spiridon, and Vaden-Goad, as the conduct relates to the First Amendment claim and substantive due process claim at issue in this motion, I hold that, because each of the defendants is an employee and acting as an agent of the University, Appel has not satisfied the "two or more actors" requirement. The motion for summary judgment on Appel's conspiracy claim is therefore granted.

D.      Service of Process in Official Capacities

Defendants argue that, although Appel properly served defendants in their individual capacities, she failed to properly effect service of process on them in their official capacities. Rule 4(e) of the Federal Rules of Civil Procedure provides that service against an individual may be effected by either following state law for serving a summons or by personal service, abode service, or service upon an authorized agent. Service upon a state officer in his or her official

capacity is sufficient if made pursuant to Rule 4(e). *See Cassie v. DuBois*, 346 F.3d 213, 216 (1st Cir. 2003); *see also Echevarria-Gonzalez v. Gonzalez-Chapel*, 849 F.2d 24, 28-30 (1st Cir. 1988); *Stoianoff v. Comm'r. of Motor Vehicles,* 208 F.3d 204, 2000 WL 287720 (Table) (2d Cir. 2000); *Strong v. Board of Educ. of Uniondale Union Free School Dist.*, No. CV-90-2373, 1991 WL 37053 (E.D.N.Y. March 13, 1991); *Richards v. New York State Dept. of Correctional Services*, 572 F. Supp. 1168, 1172-73 n.3 (S.D.N.Y. 1983) (J. Goettel) (noting that personal service pursuant to Rule 4(e)'s predecessor controls rather than the rule governing service upon a state where the suit is against a state actor in his official capacity and recovery sought is under the Civil Rights Act). Because Appel properly effected individual service as set forth in Rule 4(e), she has also satisfied the requirements with respect to service in the defendants' official capacities.

## IV.    Conclusion

For the foregoing reasons, the motion for summary judgment is granted in its entirety with respect to Wells, Wallace, Hawkes, Grimes, Echevarria and Schmotter. Appel's claims that she was retaliated against as a possible witness at Young-Caruso's reopened fact finding and her conspiracy claim fail as a matter of law and the defendants' motion for summary judgment is granted on those claims. The following claims survive the motion for summary judgment. Appel's substantive due process claim will proceed against Rinker, Spiridon and Vaden-Goad. Appel's claim of First Amendment retaliation concerning her 2006 lawsuit shall proceed against Rinker and Spiridon. Appel's claim of First Amendment retaliation arising out of her 2005 CHRO testimony will proceed against Spiridon and Vaden-Goad. Having determined that each

of the defendants, Rinker, Spiridon and Vaden-Goad have been properly served, the case will proceed against them their official and individual capacities.

It is so ordered.

Dated at Bridgeport, Connecticut this 18th day of August 2011.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge
