UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

ROSALIE APPEL                    :  No. 3:06CV-1177 (SRU)
                                 :  915 Lafayette Boulevard
            vs.                  :  Bridgeport, Connecticut
                                 :
                                 :  December 13, 2013
CHARLES P. SPIRIDON, ET AL       :

- - - - - - - - - - - - - - - - x


TESTIMONY OF HWA YOUNG CARUSO AND TERRY WELLS


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

            JOHN R. WILLIAMS, ESQ.
                51 Elm Street, Ste. 409
                New Haven, Connecticut  06510

    FOR THE DEFENDANTS:

            OFFICE OF THE ATTORNEY GENERAL
                55 Elm Street
                Hartford, Connecticut 06106-1774
            BY:  JOSEPH A. JORDANO, AAG
                 BETH Z. MARGULIES, AAG



                Susan E. Catucci, RMR
                Official Court Reporter
                915 Lafayette Boulevard
             Bridgeport, Connecticut  06604
                 Tel: (917)703-0761

I N D E X

WITNESSES:

HWA YOUNG CARUSO

Direct Examination by Mr. Williams..................271
Cross Examination by Mr. Jordano...................287

TERRY WELLS

Direct Examination by Mr. Jordano..................432

```
 1              THE COURT:  Everybody ready?

 2              MR. WILLIAMS:  Yes, Your Honor.

 3              THE COURT:  Bring the jury, please.

 4              (Whereupon the jury entered the courtroom at

 5      11:10 o'clock, a. m.)

 6              THE COURT:  Ladies and gentlemen, sorry for the

 7      delay.  I had a little bit of a computer glitch, going

 8      back to the idea that technology is our friend and we got

 9      that sorted out.  So I think we're ready for our next

10      witness.

11              MR. WILLIAMS:  Yes, we are, Your Honor.

12      Professor Caruso.

13      H W A     Y O U N G     C A R U S O,     called as a

14      witness on behalf of the Plaintiff, having been duly sworn

15      by the Court, testified as follows:

16              THE COURT:  Please be seated, state your full

17      name and spell your last name for the record, please?

18              THE WITNESS:  My name is Hwa Young Caruso.  Hwa,

19      H-W-A, Young, Y-O-U-N-G, Caruso, C-A-R-U-S-O.

20              THE COURT:  Thank you.

21      DIRECT EXAMINATION

22      BY MR. WILLIAMS:

23      Q.   Good morning, ma'am.

24      A.   Good morning.

25      Q.   You're here pursuant to a subpoena, is that correct?
```

1    A.   Yes.

2    Q.   Where are you employed at this time?  Where do you

3    work?

4    A.   Currently I'm working at the college in Long Island,

5    New York.

6    Q.   What is the name of the college where you are

7    employed?

8    A.   Malloy College.

9    Q.   And what position do you hold at Malloy College?

10   A.   Currently I am Associate Professor of Art.

11   Q.   How long have you been on faculty at Malloy College?

12   A.   Since 2004, Fall, so that would make about ten years.

13   Q.   All right.  Could you tell us what professional --

14   what your professional background is, what your degrees

15   are and your background and experience in your field?

16   A.   Yes.  I'm going to focus on my degree because you are

17   dealing with the teaching area.  My degree is, first, BF,

18   Bachelor of Fine Arts from the best university in South

19   Korea, Ewha University, I finish in 1983.

20        And in 1991 -- may I use a little bit -- information

21   from just memory.

22             THE COURT:  Actually let's try not to do that,

23   so just --

24             THE WITNESS:  Yes, okay.  It's just dates.

25             THE COURT:  Put that away and tell us from your

1    memory.  And if we need to, we'll --

2              THE WITNESS:  Yes, I'll do that.

3              THE COURT:  So just close that.  Thank you.

4    BY THE WITNESS:

5    A.   1991, I received Master of Fine Arts from University

6    of Connecticut in painting and drawing area.

7         And in 2004, I finish my doctorate degree in college

8    teaching of art from Colombia University.  After --

9    Q.   Go ahead.

10   A.   Go ahead?  Before I receive my full-time position at

11   Malloy College in New York, I worked about for eleven

12   years at Western Connecticut State University from 1993 to

13   Spring 2004.  So I was part time instructor at Western

14   Connecticut State University.

15   Q.   Okay.  And you were a part time instructor at Western

16   Connecticut State University from '93 to '04 in what

17   field?

18   A.   At that time, because I was part time, I taught in

19   drawing area but I was able to absorb Professor Rosalie

20   Appel's teaching and class experience, my observation, and

21   all students' exhibition, and I had professors in and out

22   just a little bit in direction.  Especially also I

23   participated in a couple of department, important

24   department meetings.

25   Q.   All right.  Now, in that respect, did there come a

1    time in 2003 when you became aware that there was an

2    opening for a full-time faculty position in the Art

3    Department?

4    A.   Yes, correct.

5    Q.   And can you tell us whether or not you applied for

6    that position?

7    A.   Yes.  I have, yes, I apply.  But may I add the detail

8    of my experience from beginning to application time?

9             MR. JORDANO:  Objection.  Question's been asked

10   and answered.

11   BY MR. WILLIAMS:

12   Q.   I'll get to that but I want to focus on this.

13   A.   Could you please repeat?

14   Q.   Yes.  Did you apply for the open position of

15   full-time faculty person in the Art Department?

16   A.   Yes, I applied full-time position in -- that followed

17   advertisement, yes.

18   Q.   All right.  Now, did you attend a faculty meeting --

19   A.   Yes.

20   Q.   -- in September of 2003?

21   A.   Correct.

22   Q.   And in which something unusual happened regarding the

23   position you had applied for?

24   A.   Yes.

25   Q.   What was it that happened at that meeting?

A.    Yes.  September 10th, 2003, around 12:00 o'clock I
attended a meeting, a department meeting.  I went early
because before I went to that meeting, I pay attention to
department meeting agenda.  One of the agenda was hiring
process, so I was part time person, I pay attention.  I
went there.

In that meeting, of course me and chairperson, Abe
Echevarria, Margaret Grimes, John Wallace, Walter Belkey,
David Skora, Charles Spiridon and Rosalie Appel, we fill
the front of the table, we face to face with that.

Abe Echevarria began department meeting.  He open the
meeting.  David Skora was taking the minute.  When Abe
Echevarria began to discourse about hiring process, out of
the blue, Margaret Grimes, saw face to face, very close,
"What degree are you getting?"  So I said, out of the blue
I said, "I am getting doctorate degree from, doctoral
degree in art from Colombia University."  Then she said,
again out of the blue, "Doctoral degree doesn't count."

I was -- minute, something just hit my head.  I was
quiet.  Then she said suddenly, again out of the blue, "We
are going to bring Marjory Portnow from Wield Farm (ph)."
That's farm name.  I was so shock, I don't know what is
going on.  What's got to do with my degree?  Who is
Marjorie Portnow?

So I had a pencil, a pen, I took just quick note to

1    myself, because I was a little bit shock.

2         Then, John Wallace said, "Yes, we are going to put in

3    her."  And my heart is pounding -- and Walter Belkey said,

4    "Yes, we are going to bring her."  Whoa.

5         Then Abe Echevarria, Chairperson, said -- I need to

6    collect myself for a minute.

7         (Pause)

8         Chairperson Echevarria veracity said, "Yes, we are

9    going to bring her."

10             THE WITNESS:  May I just quickly look paper?

11   Little bit?  Just to show because I need to calm a little

12   bit.

13             THE COURT:  Just tell us what you remember.

14             THE WITNESS:  Yes.

15             THE COURT:  We'll do that later if we need to.

16   BY MR. WILLIAMS:

17   Q.   In any event --

18   A.   No, I have a very clear memory.  My heart is a little

19   bit compressed because I'm putting myself in that

20   position.

21        And then, yes, then I said, this is strange.  They

22   said we are going to have, we are going to have a

23   discussion about hiring process, but this woman and

24   chairperson, all these professors said all of them pick

25   the person's name and they are talking each other and

1    asking my qualification.

2         Then Abe Echevarria said, "Oh, Margaret Grimes you

3    are going to make advertisement.  You are in charge."  All

4    of the names and asking the advertisement about that

5    position.  So, getting stranger and stranger.  I am

6    immediately shock.

7         And then he said, "Oh, you are, you are going to be

8    chair for that such, painting such area."  Remember now,

9    two different positions.  One is painting area, one is

10   graphic design area.  I was interested in painting studio

11   area, they call the studio area.

12        Then on a matter, long time adjunct, his name is

13   David Skora, I remember he was writing the minute, the

14   part of the meeting.  And then time went by, and now

15   finish discoursing about studio painting area.  Now we

16   move to graphic design area.  That's David Skora area,

17   part time teaching, but I didn't know he was just hired.

18   Without any knowledge he was hired as a full-time person.

19   That's why he had to write, to take note.

20        Then he suddenly, he said, again out of the blue, he

21   was writing like this and then he, he sat next to me.

22   Said, "What about me?"  And I said what about me?  Almost

23   he was saying what about me if you are hiring already

24   Marjory Portnow, you have to guarantee my job, too.

25        And then Abe Echevarria said, "Don't worry, you'll be

```
1    working for here long time.  Don't worry, you'll get
2    hired."
3         We are talking about hiring process that day,
4    advertisement, but already second person said, "What about
5    me," and Professor said, "Don't worry, you'll get hired."
6    Then Margaret Grimes, John Wallace, Walter Belkey said
7    same thing.  "Don't worry, we are the department
8    evaluation committee member."  He says, "Don't worry,
9    we'll evaluate you."
10        And I was just -- remember, I am part time person,
11   powerless.  In the eye only I observe.  This is illegal
12   process.  This is illegal.
13             MR. JORDANO:  Objection, Your Honor.  It's a
14   narrative, it's a narrative.  There's no questions and
15   it's a narrative that goes on and on.  No question
16   pending.
17             MR. WILLIAMS:  I think it's responsive.  She's
18   telling what happened at the meeting.
19             THE COURT:  Well --
20             MR. WILLIAMS:  I'll ask another question.
21             THE COURT:  What happened next.
22   BY MR. WILLIAMS:
23   Q.   So, after you had heard all of this, you heard that
24   they supposedly were forming search committees for these
25   two jobs, yet they had already decided who was going to
```

1    get them?

2    A.    Yes.

3    Q.    And you reacted that that was -- as you told us, your

4    reaction was that that was illegal?

5    A.    No, I could not -- how can I say possible that it's

6    illegal?  I am just a part time person.

7    Q.    In other words, you weren't allowed to speak?

8    A.    How -- I was very cautious.  Remember, remember,

9    Margaret Grimes beginning in that meeting already said

10   "Your doctorate degree doesn't count."  That was her word.

11   Already put me down, don't even bother to think of apply.

12   You have no chance.  We have named it and doctoral degree

13   doesn't count.  Didn't ask any my other degree.  I already

14   have an MFA degree.

15       So I was crushed down.  How can I say possibly that's

16   illegal, all that?  I was composing myself.  I just took a

17   note.  But I thought about it anyway.  I went home and my

18   husband, John Caruso, he was chairperson of the

19   Alternative Action Committee, like anti-discriminatory or

20   illegal hiring process, committee at the Western

21   Connecticut State University at that time.  So I discuss

22   it with him.  He said this --

23            MR. JORDANO:  Objection.

24            MR. WILLIAMS:  That would be hearsay.

25

BY MR. WILLIAMS:

Q.   As a result of having your experience at that faculty
meeting --

A.   Yes.

Q.   And then discussing it with your husband --

A.   Yes.

Q.   Did you, in fact, file a complaint of unlawful
employment discrimination with the Connecticut Commission
on Human Rights and Opportunities?

A.   Yes, I did.  I said this is for my basic, of the
basic, of the basic knowledge.  Everybody can tell.
Everybody can tell that process, so I said first, before I
make anything big thing, I went to inside.  I made not a
comedy who is in charge in that area.  Her name is Barbara
Barnwell.

     So I went, I made appointment.  I went with my
husband and I explain everything detail.  She, at that
time she discourage me to file it, discourage me to file
that but, so I went home, I thought about a lot.  But I
reflected, I believe in moral ethical issue.

     I went to school and when I came to America, I
believe in equality American.  Maybe I was naive, I do not
know, but I know American total entire world democratic
process, how demographic process works, where you hear
everybody's voice, old, middle, young, educated, not

```
1    educated, high class, middle class, low class, all equal,

2    we have a voice.  So I strongly believe in moral ethical,

3    I believe in demographic process.  That's why I went to

4    her first, so didn't suffer me.  Do whatever you want to

5    do.

6         So I came home.  I wrote a very clearly that document

7    I have.  Then she made the -- of course I went couple of

8    days later, somehow, and I summoned with the courage.  I

9    said I cannot close my eye.  I cannot close my ear.  I

10   summoned it and then, and at that time I met with the

11   Chuck Spiridon about 90 minute, that is right.  Chuck

12   Spiridon, then Chuck Spiridon was at that time hiring

13   dean, Human Resources dean.  And then Barbara Barnwell and

14   we met together.  Barbara Barnwell talk me and my husband

15   over 90 minute.  They didn't say anything.  They want to

16   hear, so I trust all the memory.  I talk, talk and talk,

17   but they pretend everything, nothing happened, nothing.

18   Absolutely silence.  Only want to get information.  So I

19   said this is strange.  Only want to get information.

20        But later I found out something was wrong.  In

21   fact --

22             THE COURT:  Well, ma'am, I'm just going to

23   interrupt you.  Let's try to do this more in bite sized

24   pieces, if we can.

25             THE WITNESS:  Okay.
```

1    BY MR. WILLIAMS:

2    Q.   Sure.  So if I can quickly recap and we can move on.

3    A.   Yes.

4    Q.   So, your initial reaction was to try to take care of

5    it at the university level?

6    A.   Yes, correct.

7    Q.   You went to Barbara Barnwell and complained?

8    A.   Didn't work.

9         MR. JORDANO:  Objection.  I object to this line.

10   Relevancy.  Goes to the merits of her claim?  No.

11        THE COURT:  Well, I mean it's just being a recap

12   here, but let's go ahead and move on.

13   BY MR. WILLIAMS:

14   Q.   So, the meeting with Barbara Barnwell didn't go well

15   so you had a meeting with defendant Spiridon?

16   A.   Yes, that a second meeting.  Again both was all stone

17   face.  Never happened, what's going on, all that.  So I

18   was discourage.

19        That time I decide -- oh, that is right, memory came

20   back -- and at that meeting they are the one said, Go

21   head, file the complaint CHRO.  That's right.  They are

22   the ones said go ahead, nothing happened here, go to the

23   CHRO.

24        So first time I go to the CHRO.  So I went to CHRO, I

25   filed the formal complaint.  That was Spring 2004.  Yes,

1   or by March, yes, I did.  And then after that, I waited, I

2   waited until 2005.  Call meeting and at that point Rosalie

3   Appel came and testified.  And then 2007 she testified

4   again, twice.

5        That's the big picture but you can dissect.  I can go

6   detail.

7   Q.   Okay.  That was actually the point that I wanted to

8   get to.  You went to the CHRO?

9   A.   Yes.

10  Q.   And they gave you two hearings; one was held in '05?

11  A.   Yes.

12  Q.   And one was held in '07?

13  A.   Yes, correct.

14  Q.   And Professor Appel testified on your behalf at both

15  of those hearings?

16  A.   Yes, correct.

17  Q.   Now, during the time that you were a part time

18  faculty member --

19  A.   Yes.

20  Q.   -- at Western Connecticut State University, you've

21  told us about the faculty meeting you attended in

22  September of 2003.  Did you attend other faculty meetings

23  as well?

24  A.   Yes, correct.  So I have, I had observed how they

25  treated Professor Rosalie Appel, how they work together as

1   group.  May I describe little bit more?

2   Q.   I'm going to ask you a question.

3   A.   Yes.  Yes, I did.

4   Q.   First I want to ask you, I wanted to ask you about

5   Professor Appel, your observations.  When you attended

6   faculty meetings during the time you were a part time

7   professor --

8   A.   Yes.

9   Q.   -- in the Art Department, were you able to observe

10  Professor Appel's interactions with other faculty members

11  at the faculty meetings?

12  A.   Yes.

13  Q.   Did she, as you observed her, was she behaving

14  improperly?

15  A.   Improperly?

16  Q.   Was she creating trouble?  Was she a trouble maker at

17  faculty meetings?

18  A.   I'm going to rely on total my observation, my

19  experience.  Whenever I observe in the meeting or whenever

20  I observe faculty meeting, she did not disrupt the

21  meeting.

22       I will say Rosalie Appel is very intelligent

23  professor.  She is well read professor in history, so she

24  was able to connect her knowledge and her teaching.  She's

25  a very intelligent professor with skill.  And she has, she

```
 1    has a very high standard moral ethical principle

 2              MR. JORDANO:  Objection, objection.  Relevancy.

 3              THE WITNESS:  Yes, I will get there.

 4              THE COURT:  Ma'am, ma'am --

 5              THE WITNESS:  I will get there, I will get there

 6    quickly.

 7              THE COURT:  Ma'am, just a minute.  You need to

 8    answer the question.

 9              THE WITNESS:  Yes.

10              THE COURT:  Only the questions so wait.  Just

11    pause.

12              THE WITNESS:  Yes.  Yes.

13              THE COURT:  Let's get a question.

14              THE WITNESS:  Yes.

15              THE COURT:  Just a minute.

16              MR. WILLIAMS:  Yes.

17    BY MR. WILLIAMS:

18    Q.   Here's the question.

19    A.   Yes.

20    Q.   What --

21    A.   Yes, I tell directly --

22              THE COURT:  Ma'am --

23    BY MR. WILLIAMS:

24    Q.   Let me ask a question first.

25    A.   Yes.
```

Q.   What did you observe about the interactions between
Professor Appel and the other faculty members at the
faculty meeting?
A.   Yes, I will.  Rosalie Appel was always spoke whatever
correct.  When she heard correct, she rely on her
principle, then they said yes, that's incorrect, yes,
that's correct.  And those other professor in that group,
they do not want to hear what she's pinpoint, like a
corruption kind of thing.  She said, no, that's incorrect
process.

     Then she said, without hesitation, group member that
occupy our department faculty member always made decision
first and made her separate.  So group and her -- treated
her with disrespect.  Whether her opinion, her thoughts
correct based on her principle didn't matter.  We are
group, we are group, gang.  We made the decision.  Go
ahead.  Corruption, please.  Close eye, close ear.  We
didn't hear anything.  We made the decision.  We have five
or six number.  You are only one.

     Rosalie put her voice, disrespected, and she was
marginalized.  I observe, I experience just like I
experience September 10th, 2003 and, again, disrespected
her, disrespected anybody else.  We are the majority
member.  Silencing one, two minority voice.  Eye, ear.
Yes, that I observed.  She did not disrupt.  She was

```
1    speaking her belief, right or wrong, principle, yes.
2    Q.    Thank you, ma'am.
3              MR. WILLIAMS:  I have no further questions.
4              THE COURT:  All right.  Cross?
5              MR. JORDANO:  I think so.
6    CROSS EXAMINATION
7    BY MR. JORDANO:
8    Q.    You stopped working at Western Connecticut State
9    University in August of 2004?
10   A.    End of August 2004, because I was --
11   Q.    No, just answer my question.
12   A.    Yes, correct.
13   Q.    And you did not attend any faculty meetings after
14   that date?
15   A.    When you say August 2004?
16   Q.    Yes.  You ceased being an employee at Western
17   Connecticut State University in August of 2004?
18   A.    Yes.
19   Q.    So from --
20   A.    So after that, I did not have a chance to make any
21   meeting.
22   Q.    All right.  So you didn't observe Rosalie Appel in
23   any faculty meetings during the entire 2004 to 2005
24   academic year, isn't that correct?
25   A.    She -- 2004 -- after August 2004, yes.
```

1  Q.  So after --

2  A.  Simple.  Yes, no.

3  Q.  Now, at the meetings that you did attend --

4  A.  Yes.

5  Q.  -- you attended several in 2003?

6  A.  2003 and 2004, because I cannot remember exact date

7  now, but I'm mad.  That's impossible, but I'm mad.

8  Q.  I didn't ask you for a date, ma'am.  Now, just

9  answer my question.

10     During these meetings you noticed that at times the

11  faculty would vote on different issues, correct?

12  A.  Yes.

13  Q.  They would have a discussion?

14  A.  Yes.

15  Q.  And then the majority would vote and decide a

16  particular motion or an issue, correct?

17  A.  Yes.

18  Q.  And all the faculty there were entitled to, at least

19  the full-time faculty, were entitled to speak what was on

20  their mind regarding whatever issue was being discussed?

21  A.  That's individual's decision.

22  Q.  Yes.

23  A.  Even though they have opinion sometimes reflecting

24  whatever each individual -- not everybody always talk.

25  Sometimes some professor, like you said --

1  Q.   Let me say the question again because I think I --
2  misunderstood it.
3      I said at the meetings, each professor had the right,
4  if they wanted, to speak their mind on an issue, if they
5  chose to do so?
6  A.   It's their decision.
7  Q.   That is right, their decision.  And you said that
8  Rosalie Appel, if I understood you, Rosalie Appel would
9  speak her mind, if she thought something, she raised her
10 hand, she would speak what was on her mind, is that
11 correct?  Is that what you just told us?
12 A.   Rosalie is a very intelligent woman.
13 Q.   Did you tell us, did you tell this jury on this
14 stand, did you raise your hand and say she would speak her
15 mind; whatever is in her mind, whatever she thought, she
16 would speak that.  Is that what you told these people here
17 today?
18 A.   According to -- it depends on Rosalie's intelligence.
19 I didn't say -- that is my gesture.  That is my own, own
20 thoughts.
21 Q.   Your decision --
22 A.   Nothing to do with Rosalie or anybody else.
23 Q.   That's your description of how you saw her behave?
24 A.   It's not behave.  She never raise anything.  It's my
25 behavior.  I just, because I know I'm trying to put

1    myself -- I never saw Rosalie like that.  It's me.

2    Q.   Did you ever see Rosalie raise her voice at those

3    meetings?

4    A.   Rosalie raise voice when she talks through telephone?

5    Even myself sometimes, in sometimes heat of the moment,

6    even now sometimes I talk quietly, sometimes I talk

7    because I have to go back in my memory.  I think that's a

8    human being not losing mind but depends on your memory or

9    intelligence, all that.  Not every time.

10   Q.   Let me ask you my question again.

11   A.   Yes.

12   Q.   I didn't ask you, I didn't mention the word

13   telephone.  My question to you was at the meetings when

14   you observed Rosalie Appel, did you ever see her raise her

15   voice when she was making her point?

16   A.   She was always talking like usual.

17   Q.   And was that loud?

18   A.   Her voice is not very loud.  In fact, I am the louder

19   than her, even when I'm smaller.

20   Q.   Did you ever see her speak over people?

21   A.   Speak over people?

22   Q.   While others are trying to speak?

23   A.   Over people -- if she believes that's correct and

24   right and principle.

25   Q.   Then she would?

A.   She would, however, even though --

Q.   Okay, I just asked you a question.  Your answer was
if she believed in her point, she would.  Is that your
answer to my question?

A.   But is a tone of the voice that make others angry or
disrupt, because sometimes a joyous time.  Oh, I can be
very loud.

Q.   All right.  I didn't ask you that question.  Thank
you.

A.   Oh, yes.  When I angry I'm very loud and sometimes
just like --

Q.   Ma'am, I don't have another question pending.  You've
answered my question.  Thank you.

A.   Yes.

Q.   I weren't to turn to a different topic for a moment.

A.   Yes.

Q.   All right?  Were you aware, were you aware that in
July of 2003, David Skora had been hired as a special
appointment for one year?

A.   I have to go back to memory.  I have to listen one
more time.  Can you repeat, please?

Q.   I will.  I'll repeat it again.  I don't mind at all.
Were you aware that in July of 2003, that David Skora --

A.   Yeah.

Q.   -- was hired by Western on a special appointment for

1    one year?

2    A.   At that time I have no idea because I give a date

3    because the first time I saw next to me was -- September

4    10, 2003.  So your question is July 2003?  No.  No, I

5    didn't know but I have another --

6    Q.   Excuse me, ma'am --

7    A.   I can say another.

8    Q.   Were you aware in September of 2003?

9    A.   Yeah.

10   Q.   You met Mr. Skora at the meeting, that he had been

11   hired on a one year special appointment?

12   A.   No, but that moment, the moment I learned because Abe

13   Echevarria and other faculty member said, don't worry, you

14   have just got hired.  Oh, congratulations, you are hired.

15   That moment I learn that you hired.  What about me?  Then

16   they said --

17   Q.   Let me go back, ma'am.  So you learned in September

18   of 2003 at the meeting that Mr. Skora had been hired on a

19   one year employment, you learned at that meeting for the

20   first time?

21   A.   Yeah, right that time, but --

22   Q.   Okay.

23   A.   -- I learn of two position.  I have one --

24   Q.   Ma'am --

25   A.   All right.

```
 1              THE COURT:  Ma'am, just, you have to wait for
 2     him to ask a question.
 3              THE WITNESS:  Okay.
 4     BY MR. JORDANO:
 5     Q.   Now, that special appointment for Mr. Skora was in
 6     graphic design, isn't that right?
 7     A.   Until then I didn't know, but my --
 8     Q.   Okay.
 9     A.   My -- because the way they talking when they were
10     talking about Marjory Portnow, it was studio art.  So
11     after we finish studio art discussion long time, and then
12     move to graphic design area.  Then what about me?  So
13     that's how department develop or we will evaluate you for
14     one year working.  Then, and then my shock was coming
15     again.  Wow, graphic design and studio area, two area.
16     But --
17     Q.   I want to you stop, stop.  Now, listen, you need to
18     really -- I'm going to ask you to follow the judge's
19     instruction.
20     A.   Yes, I will.  Yes, I will.
21     Q.   Listen to my question, answer my question, all right?
22     A.   Yes.
23     Q.   All right.  Now, at that same meeting.
24     A.   Yes.
25     Q.   At that time, same meeting.
```

```
1    A.   Yes.

2    Q.   All right?  Did you learn that Ms. Portnow was going

3    to be hired as a special appointment?

4    A.   Oh, no.

5    Q.   Okay.  So you were not -- so now, does it --

6    A.   Excuse me.  Can you repeat that one more time

7    about -- because so many things going on.  Yeah, can

8    you --

9    Q.   Yes, I can.

10   A.   About Marjory Portnow, what did you say?

11   Q.   At the September 2003 meeting --

12   A.   Yes.

13   Q.   -- did you also learn that Ms. Portnow was going to

14   be hired on a special appointment?

15   A.   Your question is now Ms. Marjory Portnow is going to

16   be hired as special appointment?

17   Q.   In 2003, did you learn that in 2003?

18   A.   No.

19   Q.   All right.  Now, have you ever read the collective

20   bargaining agreement that covers faculty?

21   A.   Well, not -- how can I possibly read the entire page.

22   Yeah.

23   Q.   And then your answer to me is, no, you haven't read

24   it?

25   A.   No, I read it because of my case, my CHRO case.  So I
```

1    look through it, but some ten years, how can I possibly

2    memorize every line?  That's a lie.  But I know some.

3    Q.   Now, for special appointment?

4    A.   Yes.

5    Q.   Special appointment, that can be made -- there is no

6    search for that position, correct?  You're just hired by

7    the department chair.

8    A.   That is hired by department chair?

9    Q.   Right.  Is that correct, that's your understanding,

10   for special appointment?

11   A.   (Pause)

12            THE COURT:  Do you know?

13            (Pause)

14            THE WITNESS:  At the time I didn't, I think I

15   didn't know what the special appointment.

16   BY MR. JORDANO:

17   Q.   Do you know that for a fact today that a special

18   appointment does not require a search?

19   A.   However --

20   Q.   Do you know today whether or not a special

21   appointment is done by the chair, a special appointment?

22   A.   If that was policy.

23   Q.   All right.  Now, in 2003 into the 2004 year, you

24   applied for a tenure track position?

25   A.   Yes.

1    Q.   Is that correct?

2    A.   Yes.

3    Q.   All right, and that position actually involved a

4    search, correct?

5    A.   Yes.

6    Q.   An advertisement was posted for the position that you

7    sought?

8    A.   Yes.

9    Q.   The landscape painting position, correct?

10   A.   It was never said landscape painting.  Please,

11   understand, that was a very small part that they --

12   Q.   All right, all right.

13   A.   I want to continue.

14   Q.   Well, you applied for a position that was posted?

15   A.   Posted --

16   Q.   An advertisement?

17   A.   Yes, but I --

18   Q.   Not for the graphic design position.

19   A.   Of course, I only applied one position.

20   Q.   All right.  And you sent in your application?

21   A.   Yes, I did.

22   Q.   And it went to a search committee.  There was someone

23   in the advertisement that you were supposed to send your

24   application to?

25   A.   Yes, I did.

1    Q.   And do you remember where that went?

2    A.   Search committee?

3    Q.   All right.

4    A.   If I have --

5    Q.   And do you know, and do you know if the search

6    committee looked at your application?

7    A.   When?

8    Q.   No, I'm asking do you know.

9    A.   Do I know what?

10   Q.   Do you know if the search committee reviewed your

11   application?

12   A.   I learn that process over my own CHRO case

13   investigation, yes.

14   Q.   And did you also learn that other people had applied

15   for the same position you wanted?

16   A.   Yes, 38 other members, all around wherever, applied,

17   yes.

18   Q.   And one of the people who applied for that position

19   was Ms. Portnow, correct?

20   A.   Yes.

21   Q.   And she was a person who had a national reputation in

22   painting, correct?

23   A.   Until I saw resume, how do I know?

24   Q.   Have you ever seen --

25   A.   I never saw her at work.  I never heard her name.  I

1    never knew her existed in the world until Margaret Grimes,

2    she was search committee chair in painting.  She's the one

3    who put the advertisement, and first time ever I learn

4    Marjorie Portnow from right that person, Margaret Grimes,

5    who put the advertisement, who put the -- who told me name

6    of the person who was search committee chairperson, who

7    thought where she was working, that was weird form, who

8    thought she is a nationally recognized, like actress.  I

9    did not know, not until that time.  That's why I wrote

10   down her name.

11       What a strange thing is all already know everything,

12   and she's the one made advertisement?  Her biographical

13   thing put in the advertisement?  And next with Ms. Portnow

14   now biography and made advertisement.

15   Q.   So, when you looked at this advertisement --

16   A.   Yes.

17   Q.   You looked at it and said, boy, they are looking here

18   for a landscape painter?

19   A.   If somebody reads that, ah, there is opportunity, I

20   will apply.  Yes, I did.

21   Q.   All right.

22   A.   Because I had the qualifications and my work that was

23   begun for almost 11 years, and I knew it was a very

24   strange experience when she said out of the blue what

25   degree I was doing, I said I'm doing doctorate degree --

1    Q.    Stop -- now I didn't ask you that.

2    A.    She said doctorate degree doesn't count.

3    Q.    I didn't ask you that.

4    A.    So question mark began that moment.

5    Q.    Ma'am, please listen to my question, answer my

6    question.  You've already testified to this before, so I'm

7    trying to move through this.

8         Did you see any of the other applications for the job

9    you applied for?

10             THE COURT:  Let me just ask where we're going.

11   We're not litigating whether she was properly hired or not

12   hired, are we?

13             MR. JORDANO:  Well, I would prefer not to do

14   that but there's a been a tremendous amount of testimony

15   here, when you asked what happened at the meeting and what

16   went on and stuff, I am not litigating -- I want to make

17   sure that it's clear there was a process and someone was

18   hired and it wasn't her.

19             THE COURT:  Well, okay.  We've got that already.

20             MR. JORDANO:  I think I'll move on then, on

21   that.

22             THE COURT:  All right.

23             MR. JORDANO:  I just wanted to make sure she'd

24   seen that.

25

```
 1    BY MR. JORDANO:

 2    Q.   You testified you met with Ms. Barnwell and

 3    Mr. Spiridon on two occasions, correct?

 4    A.   Yes.

 5    Q.   They told at the conclusion of those meetings they

 6    didn't think something had been wrong and that you could

 7    go to the CHRO if you wished?

 8    A.   Yes.

 9    Q.   At the CHRO, you were present in the room?

10    A.   Yes.

11    Q.   The hearing officer?

12    A.   Yes.

13    Q.   The attorney for the university?

14    A.   Yes.

15    Q.   Yes?

16    A.   Beth.

17    Q.   Mr. Spiridon?

18    A.   Yes.

19    Q.   Right?  If you had an attorney, that person was

20    there?

21    A.   Which attorney?  My --

22    Q.   Did you have an attorney?

23    A.   Yes.

24    Q.   So that your attorney was there?

25    A.   Yes.
```

1    Q.    All right.  And then the witness who was testifying,

2    that person would be in the room when they were

3    testifying, correct?

4    A.    Witness?

5    Q.    Yes.

6    A.    Because I have to make --

7    Q.    Let me back up.

8    A.    Yes.

9    Q.    The room.

10   A.    Yes.

11   Q.    You're in the room with your attorney?

12   A.    Yes.

13   Q.    Mr. Spiridon's in the room with the university's

14   attorney?

15   A.    Yes.

16   Q.    There's a hearing officer at the end of the table

17   there?

18   A.    Yes.

19   Q.    All right.  Okay, visualize.  All right.

20   A.    Yes.

21   Q.    Now, at some point the hearing officer heard from

22   different witnesses; one would be Ms. Appel?

23   A.    Yes.

24   Q.    All right.  She was called into the room?

25   A.    Yes.

```
 1    Q.   She testified?

 2    A.   Yes.

 3    Q.   She left and someone else came in?

 4    A.   Yes, she left and then somebody come, yes.

 5    Q.   And then that person left?

 6    A.   Yes.

 7    Q.   And somebody else came in?

 8    A.   Yeah.

 9    Q.   All right.  Is that the way the entire process went

10    for the fact finding?

11    A.   Yes.

12    Q.   All right.  So the only people who were in the room

13    the whole time --

14    A.   Yes.

15    Q.   Was you, your attorney?

16    A.   Yes.

17    Q.   The hearing officer?

18    A.   Yes.

19    Q.   Mr. Spiridon?

20    A.   Yes.

21    Q.   And Assistant Attorney General Margulies?

22    A.   Yes, and Chuck, yeah.

23    Q.   Mr. Spiridon?

24    A.   Yeah.

25    Q.   Otherwise, the witnesses came and left?
```

```
1    A.    Yeah.

2              MR. JORDANO:  That's all I have.  Thank you.

3              MR. WILLIAMS:  I have no further questions.

4              THE COURT:  All right.  Thank you, ma'am.

5    You're excused.  Thank you.

6              (Witness excused.)
```