```
 1              THE COURT:  Please remain standing and raise
 2     your right hand.
 3     T E R R Y        W E L L S,     called as a witness on
 4     behalf of the Defendant, having been duly sworn by the
 5     Court, testified as follows:
 6              THE COURT:  Please be seated and state your full
 7     name and spell your last name for the record?
 8              THE WITNESS:  My name is Terry Wells, W-E-L-L-S.
 9     DIRECT EXAMINATION
10     BY MR. JORDANO:
11     Q.    Thank you.  Good afternoon, Mr. Wells.
12     A.    Hello.
13     Q.    Are you a resident of Connecticut?
14     A.    I am.
15     Q.    Are you employed?
16     A.    I am.
17     Q.    Where are you employed?
18     A.    Western Connecticut State University.
19     Q.    And what is your title at Western Connecticut State
20     University?
21     A.    I am a Professor of Art and also Chair of the
22     Department of Art.
23     Q.    And how long have you worked at Western Connecticut
24     State University?
25     A.    I've worked there since August of 1993.
```

1    Q.   All right.  And prior to that, where were you

2    employed?

3    A.   I was employed at Terry Wells Graphic Design, design

4    studio, a studio.  I continue to run that studio.

5    Q.   All right.  And would you describe for us briefly

6    your educational background?

7    A.   I have an undergraduate degree in studio art from

8    Connecticut College.  I have a terminal degree, MFA, from

9    Yale University, graphic design.

10   Q.   All right.  Thank you.  And when you first began --

11   when did you first begin at Western Connecticut State

12   University?  I apologize, 19 --

13   A.   1993.

14   Q.   And you teach in what area?

15   A.   I teach in the visible arts.  My area of specialty is

16   graphic design.

17   Q.   All right.  And is this your first teaching job after

18   getting your MFA from Yale?

19   A.   This is my first full-time teaching job after getting

20   a graphic design MFA, yes.

21   Q.   And at some point were you hired in a tenure track

22   position?

23   A.   At some point I was hired as a tenure track.

24   Q.   And were you eventually tenured?

25   A.   I was eventually tenured.

1   Q.   Do you remember when that was?

2   A.   I was tenured in, I believe it was September of 1999.

3   Give or take.

4   Q.   All right.  And from 19 -- when were you elected

5   Chair?

6   A.   I was elected Chair in Spring of '04.

7   Q.   All right.  Is that an election by the department?

8   A.   It's an election by the department.

9   Q.   When did your term begin?

10   A.   My term began in June or July of '04.

11   Q.   All right.  So from '99, when were you tenured, to

12   2004, all right, did you regularly attend meetings within

13   the department?

14   A.   I did.

15   Q.   And who was the Chair during that period?

16   A.   Would you say the time period again exactly?

17   Q.   1999, when you became tenured --

18   A.   Yes.

19   Q.   -- to 2004 when you became Chair.

20   A.   Abe Echevarria was the Chair.

21   Q.   He was the Chair the entire time?

22   A.   The entire time I was there?

23   Q.   No, the entire period.

24   A.   Yes.

25   Q.   All right.  And do you know Rosalie Appel?

1   A.   I do know Rosalie Appel.

2   Q.   How do you know her?

3   A.   I know Rosalie Appel because she is a Professor of

4   Art at Western Connecticut State University and was

5   employed there when I was employed, when I became

6   employed.

7   Q.   In fact, when you were first employed, who hired you?

8   A.   The department hired me.  Rosalie Appel was Chair on

9   sabbatical leave.  Interim chair was John Wallace.  They

10  were both part of the process, but the person who hired me

11  ultimately was the event provost vice president.

12  Q.   All right.  And then when you were hired at your

13  tenure track position --

14  A.   Yes.

15  Q.   -- who was Chair?

16  A.   Abe Echevarria.

17  Q.   And do you know if Rosalie Appel sat on -- did you go

18  through a search proceeds?

19  A.   We did go through the search process.

20  Q.   Was she on the committee?

21  A.   I don't recall exactly who was on the committee.

22  Q.   All right.  During the period --

23  A.   I don't recall.

24  Q.   During the period between 1999 and 2004, did you have

25  occasion to observe her behavior at meetings?

1 A. Yes.

2 Q. And would you describe that for me, please?

3 A. Well, her behavior was often explosive if people in

4 the meeting didn't agree with her or if her opinion was

5 different.  The meetings were usually very tense because

6 people were very apprehensive about stating their opinions

7 if it differed from her opinion.

8 Q. And do you know, do you know if she ever made any

9 accusations against the Chair?

10 A. Yes.

11 Q. What type of accusations did she make against the

12 Chair?

13 A. She accused him at one point of raiding her budget.

14 She accused him of basically scripting students.

15 Q. I don't understand --

16 A. Scripting students.

17 Q. What does that mean?

18 A. Well, what it means is that if there were issues with

19 students -- and, you know, we all have issues with

20 students in certain situations; students are people -- she

21 would say that it was the Chair that set them up and sent

22 them to her to cause trouble essentially.

23 Q. Did you ever see Abe -- did I say that correctly, Abe

24 Echevarria?

25 A. Echevarria.

1   Q.   Did you ever see him, the former Chair, do something

2   like that?

3   A.   No.

4   Q.   Now, did you ever see her yelling at Abe?

5   A.   Yes.

6   Q.   Before you became Chair?

7   A.   Yes.

8   Q.   Why didn't you say anything to anyone -- excuse me.

9   Did you say anything to anyone during that period before

10  you became Chair?

11  A.   No, not really.

12  Q.   Why not?

13  A.   I believe that it was the Chair's prerogative to do

14  something about the situation if they were managing the

15  department.  And also I was concerned about any type of

16  retaliation; for instance, maybe perhaps getting sued.

17  Q.   So now, in 2004 you become Chair?

18  A.   Yes.

19  Q.   All right?  When was your first meeting?

20  A.   My first meeting, I believe it was September of '04,

21  I believe around the 20th, 21st, something like that.

22  Q.   Let me back up for a moment.  Was there ever any

23  incident involving you and Rosalie Appel -- excuse me.  An

24  incident where you spoke to Rosalie Appel that caused you

25  particular concern about her relationship with the Chair,

1    Abe, when he was Chair?

2    A.    Yes.  One instance stands out in my mind in

3    particular.

4    Q.    I'm talking about one that concerned you.

5    A.    That very much concerned me, and this is quite a

6    while before I became Chair.  This is probably after

7    having been there five or six years.

8          Rosalie coming to me one morning agitated and stating

9    to me that her commute had been delayed because of a

10   traffic jam that occurred in New York, and that Abe

11   Echevarria caused that traffic jam.  And she wasn't

12   joking.  She was serious.

13   Q.    Why did that concern you?

14   A.    Because it's odd behavior, and I didn't know whether

15   or not I might be blamed for things that are entirely out

16   of my control.  It was strange.  I don't know how else to

17   put it.

18   Q.    Nevertheless you run for Chair?

19   A.    Eventually, yes.

20   Q.    You become Chair, you start in the Fall, I think you

21   told me September was your first meeting?

22   A.    Uh huh.  (Affirmative.)

23   Q.    And now did you did anything to set the tone for your

24   chairmanship during the first meeting?

25   A.    I did.  I was concerned about the adversarial air

1    that was integral, that was part and parcel of our

2    meetings consistently, and one of the things that I stated

3    at the meeting is that I really wanted us to get along and

4    to treat each other cordially and with respect, and to

5    have reasonable discussions about where we were going and

6    what we were doing and how we would do things.

7    Q.   Now, during that meeting, sir, did you ever dictate

8    any new rules that you expected people had to follow,

9    anything like that?

10   A.   No, I didn't do or say anything that could be taken

11   in that manner.

12   Q.   Well, now, typically, if there's a policy, procedure

13   or something the department has to decide, how is that

14   done?  What is the procedure for that?

15   A.   We have a discussion.  People have the floor, they

16   are allowed to talk about it from their perspective and

17   their opinion, and we generally come to some kind of

18   consensus or not, and we vote on it.  It's a democratic

19   process.  The majority rules.

20        However, something that would occur often is that if

21   a person had the floor and that person was not Rosalie

22   Appel, they would be yelled at or screamed at or spoken

23   over, if their opinion differed.  If it was the same, it

24   would be fine.  There would be no issue.

25   Q.   So going back to the first meeting then, was there

1    any issue that required, after you set the tone for your

2    chairmanship, was there any issue that came up that

3    required a vote of the faculty?

4    A.    Yes.

5    Q.    What did it pertain to?

6    A.    It pertained to minutes.

7    Q.    And was a vote subsequently taken?

8    A.    I'm sorry?

9    Q.    Was there subsequently a vote?

10   A.    Yes, there was.

11   Q.    And was Ms. Appel on the side that she favored the

12   vote or not?

13   A.    She did not favor the vote.  I believe it was the

14   semblance at the meeting, one person -- vote was six to

15   one.

16   Q.    And how did Ms. Appel respond?

17   A.    She was not pleased.

18   Q.    And how did she describe you?

19   A.    I was a dictator.  She called me a dictator.

20   Q.    And what happened after that?

21   A.    We moved onto other items.  I essentially chose to

22   ignore that.  And when we got near the end of the meeting,

23   an adjunct faculty member made a suggestion, said it would

24   be nice maybe if you apologized to the Chair for calling

25   him a dictator.

1    Q.   And who was that?

2    A.   That was Ed Little.

3    Q.   And how did Ms. Appel respond to Mr. Little?

4    A.   She got upset.

5    Q.   Yelled at him?

6    A.   She yelled at him.  She stated that adjuncts were

7    second class citizens and that they had no business

8    expressing themselves at meetings and they had no business

9    making motions -- he didn't make a motion, it wasn't a

10   motion -- and they weren't allowed to vote.  And basically

11   degrading him and talking down to him and being very nasty

12   to him in front of everybody.

13   Q.   Let me ask you this.  Now, during the course of that

14   first year, after that first meeting, did things improve?

15   A.   No.

16   Q.   Did they get worse?

17   A.   They were bad and they continued to be bad.

18   Q.   Did you ever speak to Dean Vaden-Goad about your

19   concerns?

20   A.   I did discuss my concerns with the Dean.

21   Q.   And what did she do, if anything, to try to rectify

22   them?

23   A.   She tried to set up meetings with Rosalie Appel and

24   myself so that we could discuss any possible concerns that

25   she may have had or I may have had.

1    Q.   And did some of those meetings occur?

2    A.   Not initially, no.

3    Q.   Did they have eventually occur?

4    A.   Eventually we did have some meetings.

5    Q.   And what was the result of those meetings?

6    A.   The results of those meetings was that Professor

7    Appel did not want to discuss any of the items that may

8    have been of issue.  She wanted to talk about something

9    else and I don't even recall especially what it was.  And

10   then the meeting came to an end.  She didn't really want

11   to have any part of it.

12   Q.   And this is during your first year?  Is this during

13   your first year?

14   A.   Yes.

15   Q.   Now, what types, what other types of issues did you

16   have with her besides just her behavior at the -- strike

17   that.  Apologize.

18        Did you have any other types of issues with Rosalie

19   Appel when you were Chair, other than her behavior at the

20   meeting, meetings during the first year?

21   A.   Yes.  There were constant concerns regarding her

22   printmaking lab.

23   Q.   Okay.  Concerns in what respect?

24   A.   Primarily to do with, with hazardous materials, what

25   were considered hazardous materials by the EPA and by the

1    University.

2    Q.   Did she get along well with the people who handled

3    that?

4    A.   No, she felt that they had no business in her area --

5         THE COURT:  Let's just be clear.  You should

6    tell us what she said.

7         THE WITNESS:  What she said?

8         THE COURT:  Or what you observed.

9         THE WITNESS:  What I observed.

10        THE COURT:  Not what other people told you.

11   BY MR. JORDANO:

12   Q.   Yes.  Regarding that issue --

13   A.   Yes.

14   Q.   -- did she tell you, did she tell you her position on

15   that regarding the people in public safety and hazardous

16   waste?

17   A.   She didn't say specifically but that there were

18   issues, that people were invading her space.

19   Q.   Did she make any comment about the disposal of

20   hazardous waste?

21   A.   She did not.

22   Q.   All right.  Were you, as Chair, would you be

23   contacted by Public Safety on occasion?

24   A.   Yes, because I had purview over the various areas,

25   including any of the labs.  I was responsible ultimately.

1    Q.   Whose responsibility is it to set the class schedule?

2    A.   The Chair.

3    Q.   And when I say "class," I mean the schedule for

4    upcoming semesters?

5    A.   The Chair is.

6    Q.   And did you have any issues with her about that?

7    A.   Yes.  Professor Appel had consistently had issues

8    with my scheduling of the classes and accused me

9    constantly to my face, via emails, phone calls, that I was

10   purposefully scheduling classes to interfere with her

11   classes so that the enrollments would be lower.

12   Q.   Is that true?

13   A.   Absolutely not.

14   Q.   At some point did that issue go to the Dean, the

15   issue of Ms. Appel's concern about classes conflicting

16   with hers?

17   A.   Yes, it did.

18   Q.   What did Dean Vaden-Goad do?

19   A.   Dean Vaden-Goad spent a great deal of time looking at

20   the classes and the overlaps and the entire schedule and

21   she made the determination that there was no significant

22   overlap, there was no overlap that would cause a conflict

23   that would impact enrollment.

24   Q.   What department monitors class enrollment itself?

25   A.   What department -- the Registrar's Office.

1   Q.   Who would be the person who would handle that at the

2   time?

3   A.   At the time?  I believe it was Irene Duffy.

4   Q.   And did she ever have any issues or conflicts with

5   that office that were brought to your attention?

6        All I want to know is yes or no, whether it was

7   brought to your attention?

8             THE COURT:  No, no, no.  No, no.

9             MR. JORDANO:  I'm not asking for the comment.  I

10  just want to know --

11            THE COURT:  Well, but you are, by the way you

12  phrased the question.

13            MR. JORDANO:  All right.

14            THE COURT:  So, lay a foundation whether he

15  knows anything about interactions --

16  BY MR. JORDANO:

17  Q.   Do you know anything, do you know if Ms. Appel had

18  interactions with the Registrar's Office?

19  A.   Yes.  There --

20            THE COURT:  No, no.  That's good.

21            THE WITNESS:  Oh.

22            MR. JORDANO:  That's a yes or no.

23  BY MR. JORDANO:

24  Q.   Do you know who she had interaction with in the

25  Registrar's Office?

1    A.    Irene Duffy.

2    Q.    And did Ms. Duffy ever voice any concerns?

3            THE COURT:  Sustained.

4            MR. JORDANO:  All right.

5    BY MR. JORDANO:

6    Q.    Were there any incidents involving the lab and acid

7    in the labs?

8    A.    Yes.

9    Q.    What happened?

10   A.    There was an incident where a student spilled some

11   acid on herself.

12   Q.    Let me stop you for a second.  As the Chair, would

13   you be informed of an incident such as that?

14   A.    I was informed.

15   Q.    All right, go ahead.  Tell me what happened?

16   A.    She spilled some acid on herself and was concerned

17   because the skin started bubbling and she had another

18   student take her to the hospital.

19   Q.    All right, and did you speak to Ms. Appel about that

20   incident?

21   A.    There were a series of emails on which I was copied.

22   Q.    From her?

23   A.    Yes.  That talked about the incident, spoke of the

24   incident.

25   Q.    And do you remember what Ms. Appel's response was?

1   A.   In the email she stated that the student spilled the

2   acid on themself on purpose to get some kind of response.

3   Q.   Would you often talk to Ms. Appel on the phone if

4   there were issues?

5   A.   Yes.

6   Q.   And when she didn't agree with what you were telling

7   her, on the phone --

8   A.   She would become verbally abusive and sometimes hang

9   up on me.

10  Q.   Did that occur during your first year?

11  A.   It occurred a number of times over the years.  I

12  don't recall specifically whether it happened in the

13  first -- yes, it did, but one call I remember in

14  general -- specifically, rather, she didn't hang up with

15  me on this one.  It had to do with a meeting that I had

16  scheduled.

17  Q.   All right.

18  A.   A department meeting.

19           MR. JORDANO:  Could you put up 509 for me,

20  please?  Orientation.  I believe that is full.

21           THE COURT:  Now it is.

22           MR. JORDANO:  Thank you.

23           (Whereupon Defendant's Exhibit 509 was marked

24      full.)

25

```
1    BY MR. JORDANO:

2    Q.   Look at this monitor, sir, if you would and tell me

3    if you recognize that document?

4    A.   Yes, I know this document.

5    Q.   Would you scroll down the document for me, please?

6    Keep going.  Stop there, if you would.

7         What is this document?

8    A.   This is a document, a petition that I generated and

9    then discussed with and had the department sign, and it

10   was basically a cry for assistance from our Dean because

11   we, we basically wanted to try and get a faculty member to

12   work well with us, with all of us.

13   Q.   Now, let me back up for a second.  Tell me how you

14   went about -- you drafted the petition; how did you go

15   about getting the signatures?

16   A.   I wrote up the petition based on some, some of the

17   specific issues that I had observed and had been party to,

18   and I gathered some documents in support.  I wrote it up

19   and I sat down with my fellow faculty and asked them if

20   they would support this, if they also, if -- whether these

21   were concerns that they shared.

22        Do you have water?

23        (Pause)

24        MR. JORDANO:  May I show him?  Hold that button

25   down, I believe.  You have to press it, you don't have to
```

1    hold it.

2    BY MR. JORDANO:

3    Q.   Now, you were telling us how you went about getting

4    the signatures?

5    A.   So I questioned from my fellow faculty whether or not

6    they agreed with the content and what we were trying to

7    express to our Dean, and they did agree indeed and

8    everybody signed it.

9    Q.   Was anybody forced to sign?

10   A.   Nobody was forced to sign it.

11   Q.   Did you give people the attachments to review as part

12   of the petition?

13   A.   Yes, the petition was all together, along with the

14   attachments.

15   Q.   Now, how did you go about selecting the attachments?

16   There's a number of them.  We've been through them before.

17   How did you select those?

18   A.   There were so many emails and so much documentation,

19   I basically went through and picked what I thought would

20   be a cross section that would express some of the issues

21   that we had to deal with regularly.

22   Q.   Now, they come from different years, they could

23   mostly before -- do most of them come before 2005?

24   A.   The bulk of them probably come from '04, the year

25   that I became Chair.

1    Q.   All right.  And did they, were they chosen in any

2    reason because of Ms. Appel's testimony in a CHRO

3    proceeding?

4    A.   Absolutely not.  I just wanted a cross section.

5    Q.   All right.  And did Dean Spiridon, did he have any

6    involvement at all in your drafting or preparing that?

7    A.   No, he did not.

8    Q.   How about Dean Vaden-Goad?

9    A.   No, she did not.

10   Q.   All right.  At the time, Dr. Rinker wasn't there,

11   correct?

12   A.   Correct.

13   Q.   Did any one of these people tell you that you need to

14   do that?

15   A.   No, this was my own initiative out of desperation to

16   change the culture within the department.  It was very

17   dysfunctional.

18   Q.   And what did you want done?

19   A.   What I wanted to do was change the culture in such a

20   way that we could all work together and if we need to come

21   to decisions as a department, that we could talk things

22   out in a reasonable professional manner.

23   Q.   And what did you want, what did you want Rosalie

24   Appel to do?

25   A.   I wanted her to speak with people and not yell at

```
1    them.  I wanted her to respect the majority vote of the
2    department, and if she had issues, my preference was that
3    she could come and speak with me about them as opposed to
4    sending reams of emails with derogatory comments.
5    Q.   Did she ever accuse you of planting students in her
6    class?
7    A.   She accused other faculty.  I don't know that she
8    said specifically faculty, which faculty other than the
9    times I, you know, observed her going after Abe.
10   Q.   Did you ever -- at some point were you ever made
11   aware of a complaint by Ms. Appel about people invading
12   her classroom or disrupting her classroom?
13   A.   Yes.
14   Q.   Would you tell me, would you describe -- did you as
15   Chair create some policy regarding that?
16   A.   Well, once I became cognizant of her concern, I made
17   it my prerogative to at the next meeting state generally
18   that all faculty members should respect other people's
19   classrooms and that they should speak with them before
20   they entered if they needed to enter for any reason.
21   Q.   And did Ms. Appel ever complain to you that Ed Little
22   had entered her classroom?
23   A.   There was an email that she sent directly to me or
24   copied me that said that she had, that she did complain
25   about it.
```

```
1    Q.   Did you speak to Mr. Little to find out if that was
2    true?
3              THE COURT:  Just -- let's go back because --
4    okay.  As I just heard that answer, there wasn't an email
5    from Ms. Appel; it was an email from somebody else.
6              THE WITNESS:  No, it was an email from Ms.
7    Appel.  I don't know whether it was sent directly to me or
8    whether it was copied but I did receive a copy.
9              MR. JORDANO:  That's what I heard.
10             THE COURT:  Let's just be clear.  This trial
11   should not be about rumor.  It should be about admissible
12   evidence.  So --
13             MR. JORDANO:  I agree, Your Honor.
14             THE COURT:  So let's just be clear in your
15   questions if you would, make it clear so we know whether
16   it's hearsay or not.
17             MR. JORDANO:  I thought my question asked if Ms.
18   Appel had done it, and I thought he said it came from Ms.
19   Appel, CC'ed to him.  That's what I heard, which is why I
20   went on.
21             THE COURT:  Maybe I misheard.  Okay.
22   BY THE WITNESS:
23   A.   Or sent to me.  I had it.
24   Q.   In any event, did you speak to Mr. Little?
25   A.   I did.
```

1    Q.   Were you able -- and were you able to determine

2    whether or not anyone had invaded her classroom.

3              MR. WILLIAMS:  Objection, hearsay.

4              MR. JORDANO:  I asked if he was able to

5    determine it.

6              THE COURT:  Right.  How would he determine it,

7    having talked with Mr. Little, without him repeating what

8    Mr. Little told him?  We have --

9              MR. JORDANO:  I'll withdraw the question and ask

10   it differently.

11   BY MR. JORDANO:

12   Q.   Other than Ms. Appel making that complaint about

13   Mr. Little, did anyone else ever complain about their

14   classroom being invade by Mr. Little?

15   A.   No.

16   Q.   Did you ever speak to Dean Vaden-Goad at any time

17   before you wrote the petition or shortly -- about any type

18   of special assessment?

19   A.   No.

20   Q.   All right.  Did you ever talk to Charles Spiridon;

21   did he ever suggest that that would be the case or

22   anything like that?

23   A.   No, I had no idea.  I knew nothing about special

24   assessments.  Didn't know what they were.

25   Q.   Now, are you familiar with the AAUP contract?  Are

1    you today familiar with the the AAUP contract and Section

2    4.13?

3    A.   I don't know what that would pertain to specifically.

4    I don't know the numbers.

5    Q.   Do you know what the special assessment section is?

6    A.   I do know now.

7    Q.   All right.  All right.  And after the petition was

8    received by the Dean, what did she do?

9    A.   She tried to convene meetings between Rosalie Appel

10   and myself and her.

11   Q.   All right, and did any of those meetings actually

12   occur?

13   A.   There was resistance to meeting, and I think it's

14   possible that at some point we finally met but to no

15   resolution.

16   Q.   Do you remember what Ms. Appel's response was at that

17   meeting?

18   A.   That it was nonsense, it was a charade.  It had no

19   meaning, no value, and that was the extent of it.

20   Q.   At some point in 2005, did you learn that Dean

21   Vaden-Goad had decided to convene a special assessment?

22   A.   Yes.

23   Q.   And as part of that under the contract did she meet

24   with you?  I'll withdraw the question.

25        Do you know as part of the contract, as part of the

1   process, that she has to meet with you, the Chairperson?

2   A.   Yes.

3   Q.   Did she do that?

4   A.   Yes.

5   Q.   Did you discuss with her the special assessment, the

6   evaluation?

7   A.   I don't recall what the specifics were that we

8   discussed relative to the special assessment.  I can't

9   tell you.

10  Q.   Do you recall a meeting for that purpose?

11  A.   We did talk, we did speak about it, yes.  I don't

12  recall specifics.

13          MR. JORDANO:  If I may have a moment, Your

14  Honor?  One moment.

15          (Pause)

16          MR. JORDANO:  579 I think is full, Your Honor.

17          THE COURT:  It is now.

18          (Whereupon Defendant's Exhibit 579 was marked

19      full.)

20          MR. JORDANO:  Make it hundred percent, please.

21  And would you go down to Section 4.13, please.  In fact,

22  if you could stop first at the top of Article four.

23  There.  There we go.  Go back up one page, 4.10.  There

24  you go.  Thank you.  Go to 4.13, I'm sorry.  Go ahead.

25  Keep going, a little further.  There we go.

1    BY MR. JORDANO:

2    Q.    You see .13 there, sir?

3    A.    I do.

4    Q.    Says "The intent of a special assessment is to

5    identify problems regarding a member's performance of

6    duties and, if necessary, to develop a plan to address

7    these problems"?

8    A.    Yes.

9    Q.    Is that the section you're familiar with?

10   A.    Yes.

11   Q.    And it says in there, says "When the appropriate Dean

12   or Vice President has reasonable grounds to believe there

13   is a problem regarding a member's performance of duties,

14   the Dean shall meet with the member and any other

15   appropriate individuals in an attempt to clarify and, if

16   necessary, to rectify the situation."

17        Do you recall having that meeting?

18   A.    Yes.

19   Q.    Is that the one you described to me earlier?

20   A.    Yes.

21   Q.    "If, following such meeting the Dean or Vice

22   President deems that a special assessment is called for,

23   the Dean shall meet and confer with the appropriate

24   Chairperson in the design of an appropriate evaluation

25   which may or may not involve the DEC and shall inform the

1    affected member in writing of the particulars of the

2    scheduled evaluation."

3        Did you have that meeting with Dean Vaden-Goad?

4    A.   Yes, we did have the meeting.

5    Q.   Now, the petition had all the members, all the

6    full-time members of the department sign it, correct?

7    A.   Yes.

8    Q.   Was anything discussed during that meeting regarding

9    the make-up of the committee?

10            THE COURT:  Which meeting?

11   A.   Yes.

12            THE COURT:  The meeting with Vaden-Goad?

13   BY MR. JORDANO:

14   Q.   Yes, the meeting with Dean Vaden-Goad was a

15   discussion about the makeup of the SAC Committee?

16   A.   Yes.

17   Q.   Would you tell me what that pertained to?

18   A.   Well, it made perfect sense that no members of the

19   department should serve on that committee, and that was a

20   primary consideration.

21   Q.   And did you -- who selected the committee members?

22   A.   I did not.

23   Q.   All right.  Do you know who did?

24   A.   I do not.

25   Q.   Now, are you familiar with the four areas of the

1    contract when it comes to performance?

2    A.   For --

3    Q.   For faculty.

4    A.   Yeah, for DEC?  Yes.

5    Q.   What are those four areas?

6    A.   Those four areas are workload, faculty workload,

7    service to the department and to the university,

8    professional activity and creative activity.

9    Q.   Were those discussed with Dean Vaden-Goad when you

10   had that meeting?

11   A.   Yes.

12            THE COURT:  Mr. Jordano, how much longer do you

13   have with this witness?

14            MR. JORDANO:  I have a ways.

15            THE COURT:  So why don't we break.  It's

16   5:00 o'clock on Friday.

17            MR. JORDANO:  I agree.  I think this is a good

18   time.

19            THE COURT:  Sir, we'll need you to come back

20   Monday morning.

21            THE WITNESS:  Okay.

22            MR. JORDANO:  Thank you, Your Honor.

23            THE COURT:  All right.  Thank you.

24

25

C E R T I F I C A T E


I, Susan E. Catucci, RMR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.



/S/ Susan E. Catucci
_____

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (917) 703-0761