```
               UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x

ROSALIE APPEL                    :  No. 3:06CV-1177 (SRU)
                                 :  915 Lafayette Boulevard
               vs.               :  Bridgeport, Connecticut
                                 :
                                 :  December 16, 2013
CHARLES P. SPIRIDON, ET AL       :

- - - - - - - - - - - - - - - - x
```

            CONTINUED TESTIMONY OF TERRY WELLS


B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.


A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        JOHN R. WILLIAMS, ESQ.
            51 Elm Street, Ste. 409
            New Haven, Connecticut  06510

    FOR THE DEFENDANT:

        OFFICE OF THE ATTORNEY GENERAL
            55 Elm Street
            Hartford, Connecticut 06106-1774
        BY:  JOSEPH A. JORDANO, AAG
             BETH Z. MARGULIES, AAG



            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917)703-0761

I N D E X

WITNESSES:


TERRY WELLS

Continued Direct Examination by Mr. Jordano.........470
Redirect Examination...............................512
Cross Examination by Mr. Williams..................504

```
1
2    T E R R Y    W E L L S,    called as a witness on
3    behalf of the Defendant, having been previously duly sworn
4    by the Court, testified as follows:
5              THE COURT:  Good morning, ladies and gentlemen.
6    Sorry for the delay.  I hope you all had a great weekend.
7              As you probably notice, we lost one of your
8    group who apparently suffered an injury over the weekend.
9    I have dismissed her from the jury and we're going to
10   continue with the evidence.
11             MR. JORDANO:  Good morning.  Good morning.
12   CONTINUED DIRECT EXAMINATION
13   BY MR. JORDANO:
14   Q.   I'm going to pick up where we left off and go forward
15   from there.  Okay?
16   A.   Yes, sir.
17   Q.   Would you put up please, 514.  Exhibit 514, full
18   exhibit.  You recognize this, sir?
19   A.   I do.
20   Q.   This is the SAC report?
21   A.   Yes.
22   Q.   All right.  520, please.  I'm sorry, 531.  My error,
23   excuse me.  Plaintiff's -- that is right.  Go down a page,
24   please, to the next page.  There we go.  Now you may
25   shrink this to 75 percent, please.  There we go.
```

1          Do you recognize this, sir?

2     A.    I do.

3     Q.    Is this the remediation plan?

4     A.    This is the remediation plan, yes.

5     Q.    In this plan, what, if anything, about this plan

6     pertained to you?

7     A.    What pertained to me in particular was the revisions

8     of Rosalie Appel's syllabi primarily.

9     Q.    And what were you supposed to do?

10    A.    I was to make sure that the syllabi be articulated in

11    such a way they were more comprehensive to the students in

12    her classroom.

13    Q.    Did you do that with anyone, along with anyone?

14    A.    Yes.

15    Q.    With who?

16    A.    With Carol Hawkes.

17    Q.    Who's Carol Hawkes?

18    A.    Carol Hawkes was Dean, Acting Dean of the School for

19    the Performing Arts at the time.  Founding, I should say.

20    Q.    And you were to look for any problem areas that you

21    identified, is that correct?

22    A.    Yes.

23    Q.    All right.  In fact, that was 6/30 of '06.

24          Then put 531 up, please.  And we'll also go -- try

25    hundred percent, please.  All right.

1        Do you recognize this?

2    A.   I do.  May I see the rest of the document, please?

3    Maybe further down.

4    Q.   Just scroll down a little, please.  Slowly.  All

5    right.

6    A.   Yes.

7    Q.   All right.  Now, what is -- do you remember when this

8    document -- what this document pertains to?

9    A.   Yes.

10   Q.   What does it pertain to?

11   A.   It pertains to Professor Appel's return to classroom

12   teaching in the Spring of '07.

13   Q.   And on what date was she supposed to start her first

14   class?

15   A.   She was to start her first class I believe it was

16   February 7th?  5th?

17   Q.   Can you look at the letter?  Can you look at the

18   letter?  Look at the letter.  Back down a little bit.

19   A.   February 5th.

20   Q.   February 5th, okay.  And did you meet with Ms. Appel?

21   A.   Yes.

22   Q.   Who else was present?

23   A.   Dean Spiridon was present and Carol Hawkes was

24   present.

25   Q.   Anyone else?  Anyone else?

1    A.    Linda Rinker may have been present.

2    Q.    And what was the purpose of this meeting?

3    A.    The purpose of this meeting was to discuss the plan

4    for remediation and how it would impact her return to the

5    classroom.  And inclusive in that meeting was what would

6    be the role of the adjuncts that had been hired to teach

7    that semester who would no longer be teaching because

8    Rosalie Appel was reinstated in the class.

9    Q.    And what was the plan for those adjuncts?

10   A.    The plan for those adjuncts was to act as

11   instructional assistants in monitored lab times which

12   would occur on alternate days to her classroom teaching.

13   Q.    All right.  And was this explained to the lab

14   assistants?

15   A.    It was explained to the lab assistants and it was

16   also explained to the lab assistants and to Professor

17   Appel that those two members would report directly to me.

18   There would be no contact between them and Professor

19   Appel.

20   Q.    So, did she have any responsibility for supervising

21   them?

22   A.    None, zero.

23   Q.    And the open hours, would you explain what you mean?

24   What time period would the lab be open?

25   A.    The lab would be open ten hours a week, opposite the

```
 1    days that Rosalie Appel was teaching.  I believe she was
 2    teaching Monday, Wednesday that semester.  The open lab
 3    hours would occur on Tuesday, Thursday.  Is my
 4    recollection.
 5    Q.   All right.  And would were these voluntarily or
 6    mandatory hours for students?
 7    A.   These were voluntary hours for students.  This was an
 8    opportunity for them to utilize the lab.
 9    Q.   Now, in prior years had students had card access?
10    A.   In prior years, students were granted card access.
11    Q.   And is this a change?
12    A.   This was a change.
13    Q.   Why?
14    A.   This was a change because in that lab there are
15    hazardous materials and over the years there have also
16    been many complaints of mishandling of materials,
17    materials left out, students being injured, students being
18    accused of sabotaging.
19         And I felt as Chair and making changes within the
20    department, throughout the department, to make the
21    facility safer, and more suitable to the students, that
22    since there were hazardous materials we provide, we would
23    provide time for them that was supervised, and sufficient
24    time they would be able to do their work outside of class.
25    Q.   Were the lab assistants still in contract with the
```

1    university?

2    A.    Absolutely, yes.

3    Q.    Now, Ms. Appel began on the 5th of February?

4    A.    Yes.

5    Q.    What happened on the 6th of February?

6    A.    On the 6th of February, I got a message from the West

7    Connect office, they had security keys access, and they

8    expressed to me that Rosalie Appel had attempted to lock

9    these two lab assistants out of the print-making lab.

10   Q.    Would you put up 532, please?  Scroll down.

11         If you would take a look at this, 532.

12         Just scroll down a little bit, please.  Stop for a

13   moment.  Thank you.

14         One of these emails is from you at the top, is that

15   correct?

16   A.    Yes.

17   Q.    And what's this pertain to?

18   A.    It pertains to the fact that these former adjuncts,

19   these people who are under adjunct contract, would

20   continue to provide instructional and supportive resource

21   in the lab.

22   Q.    Who made, who took care of this issue?  Who resolved

23   this issue regarding the lock-out?

24   A.    Ultimately?

25   Q.    Yes.  I mean were they allowed to stay?

1    A.    Yes.  I stated they must be allowed to say.

2    Q.    So you resolved it?

3    A.    Yes.

4    Q.    Okay.  Would you put 533, please?

5          Do you recognize this?  This is dated 2/7.  And so,

6    2/5, first class; 2/6, the lab assistants are locked out;

7    and now this is 2/7.  What is this?

8    A.    This is the response, Rosalie explaining very

9    comprehensively and specifically why students would not be

10   allowed carte blanch access to the lab.

11   Q.    Who is this email from?

12   A.    This email is from me.

13   Q.    And is it you explaining?

14   A.    Yes, it is.

15   Q.    And you're explaining what?

16   A.    I'm explaining why we were changing the policy with

17   regard to access to the lab, and why students would no

18   longer be allowed carte blanch access at their discretion.

19   Q.    Did the lab assistants have any responsibility for

20   Ms. Appel's class?

21   A.    At this juncture, no, none at all.

22   Q.    Now, I'm going to test your memory here, going back

23   to the 2/22/07 meeting.  Were syllabi discussed?

24   A.    Yes.

25   Q.    All right.  And what was your role, if any -- you

1    told us part of your role was to review syllabi?

2    A.    Was to review syllabi.

3    Q.    And did you do that in the Spring of 2007 semester?

4    A.    We did review the syllabi.

5    Q.    Would you put up, please, 534?

6          Would you tell me what this is here?

7    A.    Yes, this is a response to Professor Appel stating

8    that we did review the submitted syllabi.

9    Q.    And it's from who?

10   A.    It's from Carol Hawkes.

11   Q.    And you told us you and Carol Hawkes did the review?

12   A.    Yes, we did.

13   Q.    Did you suggest revisions?

14   A.    We suggested revisions, yes.

15   Q.    All right.  Did you -- and did you have a -- was this

16   the only time you looked at her syllabi during this month,

17   February?

18   A.    To my best recollection, yes.

19   Q.    Hold on.  Let's go back.  Let's do this.  Put up 537,

20   please.

21         See this memo, this is dated February 22nd?

22   A.    It was reviewed later.  This is a later revision.

23   Q.    Same month though?

24   A.    End of the month.

25   Q.    All right.  What is this?

A.   This is a response to Professor Appel from me making

some very specific remarks as to how she could further

improve the syllabi.

Q.   All right.  And this covers -- slide down a little

bit, please, go through it briefly.

     It covers a number of different topics, is that

correct?

A.   Very specific topics.

Q.   All right.  Would you go to 583, please?

     Now, would you look at 583.  Look at that for a

moment, read that?

A.   I shall.

     (Pause)

     Yes.

Q.   This is a note by you?

A.   Yes.

Q.   And in what month did it occur?

A.   This occurred in February.

Q.   And what's it pertain to?

A.   This pertains to that first meeting in February

regarding the syllabi.

Q.   All right, and what's the purpose of this memo?

A.   The purpose of this memo is to try to come to some

type, type of agreement with Professor Appel that these

changes were necessary in order to bring the syllabi to an

1   appropriate level of comprehension.  It was primarily

2   about comprehensiveness.

3   Q.   Look at the first paragraph.  Tell me how Ms. Appel

4   respond to the meetings you had in February?

5   A.   She was not pleased with the fact that we were having

6   this discussion with her, and she got extremely angry and

7   engaged in bullying behavior, as had been customary.  Many

8   times --

9           MR. WILLIAMS:  Move to strike.  Not responsive.

10  BY MR. JORDANO:

11  Q.   I'll refocus.  Bullying behavior towards who?

12  A.   Toward people in the meeting.

13  Q.   And which were who?

14  A.   It was me and it was Carol Hawkes.

15  Q.   All right.  Would you go to, please, Plaintiffs 66,

16  please.  Make it hundred percent, please.  Slide it up a

17  little bit, please.  Thank you.  Go down a little bit so

18  you can see the salutation.  Down a little bit more.

19  There we go.  All right.

20       Do you recognize this letter?  Let me know if you

21  need to scroll the letter up.

22  A.   I do.  This is a letter regarding that same meeting.

23  It also states here that Charles Spiridon was at the

24  meeting.

25  Q.   Which meeting is it referring to?

1    A.   It's referring to the March 2nd meeting, we just

2    discussed.

3    Q.   Your last memo was in February, a memo?

4    A.   Yes.

5    Q.   So then you, did you meet again?

6    A.   Yes.

7    Q.   When did you meet?

8    A.   The next meeting?

9    Q.   Yes.

10   A.   To my recollection, it was on the 22nd.

11   Q.   All right, the 22nd of February was your second

12   meeting?

13   A.   Yes.

14   Q.   When was the third meeting?

15   A.   I don't recall the specific date of the third

16   meeting.

17   Q.   Well, what meeting is this one referencing?  Were you

18   at the March 2nd meeting?

19   A.   This is referencing the March 2nd meeting.

20   Q.   Were you at that meeting?

21   A.   Yes.

22   Q.   All right.  So is that the third meeting?

23   A.   To my recollection, that was the first meeting

24   regarding the syllabi, the revision of the syllabi.

25   Q.   This is March of 2007?

1    A.    March -- okay, this is not -- okay, I'm thinking of

2    February.  All right.

3    Q.    We're all through February.  I'm removing along.

4    A.    Sorry, my fault.  This is the third meeting.

5    Q.    All right.  Would you slide the letter up, please, to

6    the third paragraph?  Stop right there.

7          Now, look at the third paragraph, if you would.

8    A.    Yes, okay.

9    Q.    At this meeting was the syllabi discussed?

10   A.    Yes.  This is an additional meeting regarding the

11   syllabi, and a response to Professor Appel's reticence to

12   deal any further with refining the syllabi and meeting a

13   criteria that was specified in order to improve the

14   comprehensiveness.

15   Q.    Do you know Cynthia Heslin?

16   A.    I do.

17   Q.    How about Christina Fey?

18   A.    I do.

19   Q.    Jessica Bock?

20   A.    I do.

21   Q.    Stacey and Stephanie Hongo?

22   A.    I do.

23   Q.    How do you know these people?

24   A.    They were all students that were that, had taken

25   courses with Professor Appel.

1    Q.   At what time?

2    A.   In '07.

3    Q.   All right.  Which semester?

4    A.   Spring.

5    Q.   All right.  Why do you recall these particular

6    students out of the Spring '07 class?

7              MR. WILLIAMS:  Objection, irrelevant.

8              THE COURT:  Sustained.

9    BY MR. JORDANO:

10   Q.   Did you have any interaction with these students?

11             MR. WILLIAMS:  I'm sorry, I couldn't hear that.

12   Q.   Did you have any interaction with these students in

13   March of '07 regarding Ms. Appel?

14   A.   I did have interaction with these students.

15   Q.   And what was the nature, what was the nature of the

16   interaction?

17             MR. WILLIAMS:  Objection, hearsay.

18             MR. JORDANO:  I asked what he did.

19             THE COURT:  I'll allow that.  Don't tell us what

20   they told you.

21   BY MR. JORDANO:

22   Q.   Just tell us what was the nature of the interaction?

23             THE WITNESS:  I'm sorry.  Don't say what the

24   students told me?

25             THE COURT:  No.  What was the nature of the

```
1     interaction?

2     BY MR. JORDANO:

3     Q.   What did it pertain to?

4     A.   It pertained to a critique in Rosalie Appel's class

5     they were concerned about.

6     Q.   And what did you observe regarding the students'

7     behavior?

8     A.   I observed a great deal of distress.  They were

9     concerned about --

10              MR. WILLIAMS:  Objection.

11    BY MR. JORDANO:

12    Q.   All right.  And what did you do with the students?

13    A.   I asked them if they felt --

14    Q.   No, what did you do with the students?

15    A.   I took the students over to H. R.

16    Q.   Why?

17    A.   I took them over to H. R. --

18              MR. WILLIAMS:  Objection for the reasons --

19              THE COURT:  Just a minute.  When he objects --

20    you should stand up, Mr. Williams.

21              MR. WILLIAMS:  I apologize, Your Honor.

22              THE COURT:  When he objects, just pause.

23              THE WITNESS:  All right.

24              MR. WILLIAMS:  I object, both because it's

25    irrelevant and because obviously his answer contains
```

1    hearsay.

2              THE COURT:  Well, the question is why, meaning

3    why did you take them to H. R.  I'll allow that.

4    BY MR. JORDANO:

5    Q.   Why did you take them to H. R.?

6    A.   They were expressing the fact --

7              THE COURT:  Okay, that's what you can't do.

8              MR. JORDANO:  No, no.

9    BY THE WITNESS:

10   A.   They were distressed.  It was my observation they

11   were clearly distressed about what had occurred in the

12   class moments before in the hallway.

13   Q.   All right.  And then why did you choose the H. R.

14   office to take them to?

15   A.   I chose them because the plan of remediation

16   specifically stated that Rosalie Appel was supposed to

17   interact with the students in a professional manner and

18   this seemed to go against what was stated, in that sense,

19   and that it was not in my purview to deal with the

20   situation.

21   Q.   And did you drop the students off at the H. R.

22   office?

23   A.   I did.

24   Q.   Did you witness if anyone in the H. R. office spoke

25   to the students?

```
 1   A.   Yes.

 2   Q.   Who spoke to the students in the H. R. office?

 3   A.   Chuck Spiridon and Linda Rinker.

 4   Q.   Now, I don't want you to tell me what they said.  My

 5   question is and you did you hear the students describe

 6   what had happened?

 7   A.   I did.

 8   Q.   What did Dean Spiridon and Dean Rinker do?

 9   A.   They asked the students if -- they asked the students

10   what had occurred in the classroom.

11   Q.   And were they told?

12   A.   They were told.

13   Q.   Do you remember when this was roughly, what part of

14   March?

15   A.   Mid March, I couldn't tell you the date.

16   Q.   Would you put up please, 545.  Defendant's 545.

17        Do you recognize this?

18   A.   Yes.

19   Q.   What is it?

20   A.   This is a communication from Charles Alexander.

21            THE COURT:  I'm sorry, 545 is not full.

22            MR. JORDANO:  I'm sorry, I thought that was on

23   the list.  Did we mention 545?

24            MS. MARGULIES:  No, it's not on the list.

25            MR. JORDANO:  Not on our list?
```

 1           MS. MARGULIES:  Not on the stipulated list.

 2           MR. JORDANO:  Apologize.  Thought it was in the

 3      stipulated list.  Don't look at that then.

 4           THE COURT:  Well, I've over ridden the jury so

 5      you can show it to the witness and get a foundation

 6      through the witness.

 7           MR. JORDANO:  I apologize.  I thought it was one

 8      of the stipulated ones for some reason.  I thought it was

 9      one of the stipulated ones.  545.

10           THE COURT:  He can see it.

11           MR. JORDANO:  He can see it?  All right.

12      BY MR. JORDANO:

13      Q.   Look at that and just read it to yourself, sir.

14      Don't discuss it but refresh your memory.

15      A.   (Pause)

16           MR. JORDANO:  Is 549 on our list?

17           MS. MARGULIES:  Yes.

18           MR. JORDANO:  Put up 549, please.

19           MS. MARGULIES:  You want me to put up 549?

20           MR. JORDANO:  Yes.  Go to hundred percent.

21      BY MR. JORDANO:

22      Q.   Look at 549.  Now, do you recognize that?  You may

23      have to scroll up a bit, please.

24           Tell me if you recognize it.

25      A.   I do.

```
1    Q.   This is a letter from Linda Rinker to Rosalie Appel

2    and look at the bottom, see if you're CC'd on it.  You are

3    CC'd on it, are you not?

4    A.   Yes, I am.

5    Q.   What does this letter instruct you to do, sir?

6    A.   This letter instructs me to make provisions for

7    students who are currently in Rosalie Appel's class that

8    were interested in alternative instructional arrangements,

9    if necessary, concerned about the learning environment.

10   Q.   Why was that?

11   A.   It's because --

12             MR. WILLIAMS:  Well, I'll object to that

13   question.

14             THE COURT:  I think we need to back up.  This

15   does not appear to be a direction to the witness.

16             MR. JORDANO:  It's a letter to her but it says

17   what Mr. Wells, I have requested what they are doing, what

18   they are to do.

19             THE COURT:  So there was a separate --

20             MR. JORDANO:  Right --

21             THE COURT:  In other words, this letter doesn't

22   do that.

23             MR. JORDANO:  No, but it reflects what they had

24   been requested to do.  I used it to refresh him on what he

25   was requested to do.
```

```
 1              THE COURT:  All right, but -- okay.

 2              MR. JORDANO:  Let me back up for a second.

 3              THE COURT:  Why don't you back up, because I

 4    don't think you have it right quite.

 5    BY MR. JORDANO:

 6    Q.   All right.  At some point were you asked by Linda

 7    Rinker to look into matters -- at some point were you

 8    asked to look into student matters in Ms. Appel's class?

 9    A.   Yes.

10    Q.   Just tell me what prompted that.

11              MR. WILLIAMS:  Objection.

12              THE COURT:  Sustained.  You're asking him why

13    Rinker did something?

14              MR. JORDANO:  I'm asking what circumstance

15    prompted --

16    BY MR. JORDANO:

17    Q.   Do you know what circumstance prompted this letter?

18              MR. WILLIAMS:  Objection.

19              MR. JORDANO:  Asked him if he knows.

20              THE COURT:  He can say yes or no.

21    A.   Yes.

22    Q.   And what was that circumstance?

23              MR. WILLIAMS:  Objection.

24              MR. JORDANO:  He can say the basis of what his

25    knowledge is.
```

```
 1              THE COURT:  The letter's in evidence so maybe we

 2   can just go to the letter.  You're asking him why Rinker

 3   did something, why Rinker asked him to do something.

 4              MR. JORDANO:  And I'm asking him what the

 5   circumstances were.

 6              THE COURT:  What circumstance caused Rinker to

 7   want to talk to him?  You know, that's the problem.

 8   You're asking him what she wanted him, why she did, asked

 9   him to do something.

10   BY MR. JORDANO:

11   Q.   All right.  Were there any instances that occurred

12   that you were aware of relating to this letter?

13   A.   Yes.

14   Q.   Tell me what the instance was, and not what people

15   told you, what the incident was?

16              MR. WILLIAMS:  Objection, hearsay.

17              MR. JORDANO:  He can say if something happened

18   without saying --

19              THE COURT:  Well, if someone told him something

20   happened, then he can't tell us.  If he saw or heard

21   something that happened, maybe he can describe that.  I'm

22   not sure where you're going with this frankly, but --

23              MR. JORDANO:  I'm going -- this was something he

24   was asked.

25              THE COURT:  Just, let's --
```

1          MR. JORDANO:  All right.

2          (Pause)

3          MR. JORDANO:  I'll let Rinker explain it then.

4    I'll let Rinker explain.

5          THE COURT:  Okay.

6    BY MR. JORDANO:

7    Q.   What did you do in response to this letter?

8    A.   What I did in response to this letter was speak with

9    the classes and ask if there were people that were

10   interested in participating in an alternate instructional

11   environment.

12   Q.   All right.  And did any students select that?

13   A.   Yes, they did.

14   Q.   And were any -- were any of the students who selected

15   that the ones you brought to the H. R. office from the

16   incident in Ms. Appel's class?

17   A.   Some of them, yes.

18   Q.   Did you report back your findings to Dr. Rinker?

19   A.   Yes.

20   Q.   Go to 555, please.  This is an email.  I believe it's

21   a full exhibit.  This is from Linda Rinker, it's to Carol

22   Hawkes and Terry Wells, is that correct?

23   A.   Yes.

24   Q.   To you?  And what's this pertain to.

25        Slide up a little bit, please?  Thank you.

1          What does it pertain to?

2     A.   This is, this is a documentation that allows me to

3     proceed with providing the alternate teaching arrangement

4     for three specific students who had made such a request.

5     Q.   All right.  And did you make those arrangements?

6     A.   I did.

7     Q.   How were -- what were those arrangements?

8     A.   Those arrangements were that these students were to

9     work with the under contract adjuncts who were now lab

10    monitors and instructional assistants for the balance of

11    the semester, to work with these students to complete the

12    semester and then to be graded by these two adjuncts.

13    Q.   Did Rosalie Appel have have responsibility for the

14    students at that point?

15    A.   She had no responsibility for the students after that

16    point.

17    Q.   Did they complete the same class that they had begun?

18    A.   Yes.

19    Q.   Were grades submitted by the adjuncts to your

20    knowledge?

21    A.   Grades were submitted by the adjuncts.

22    Q.   563, please.  I believe that's a full exhibit, 563.

23    And these are the two emails -- go down to the bottom,

24    please.

25          First one appears to be an email dated 5/30 to Carol

1    Hawkes from Ms. Appel, is that correct?

2    A.    Yes.

3    Q.    And it references Cynthia Heslin, one of the students

4    you mentioned?

5    A.    Yes, it does.

6    Q.    And she'd received an A in the class?

7    A.    She received an A from the alternate instructor.

8    Q.    And Ms. Appel wanted that changed to W, Withdrawn?

9    A.    She wanted it changed to W.

10   Q.    Go up to the next one.  Well, in this -- go up,

11   please.

12         That's another email from Ms. Appel to Dean Hawkes

13   wanting the student's grade changed?

14   A.    Yes.

15              THE COURT:  Where does it say that?

16              MR. JORDANO:  Where does it say

17              THE COURT:  Maybe I'm not seeing it.  I'm

18   curious where it says she wanted the grade changed.

19              MR. JORDANO:  It's just their implication, the

20   question in the letter as to who changed my grade of W to

21   A, which was the student withdrew.

22              THE COURT:  She's saying somebody changed her

23   grade.  She's not asking for it to be changed back, is

24   she?

25

1    BY MR. JORDANO:

2    Q.   Let me back up.  The adjuncts -- did the adjuncts

3    submit a grade?

4    A.   The adjuncts submitted grades.

5    Q.   Did Ms. Appel submit a grade?

6    A.   Subsequently she changed the grades.

7    Q.   All right.  Move up to the top, please.

8         And then this was eventually resolved?

9    A.   This was eventually resolved because -- stop there?

10   Or may I --

11   Q.   I asked you was it resolved?

12   A.   Yes.

13   Q.   Okay.

14        MR. JORDANO:  All right.  I was looking for an

15   exhibit there.

16        (Pause)

17        MR. JORDANO:  Let's go to 539.  It's an exhibit,

18   Your Honor.

19   BY MR. JORDANO:

20   Q.   This is an email.  Do you know who Walter Bernstein

21   is?

22   A.   I do.

23   Q.   All right.  And this is an email from Ms. Appel, is

24   it not, to him complaining about certain students?

25   A.   This one is Charles Alexander that I'm looking at.

1          MS. MARGULIES:  I may not be on the right page.

2          MR. JORDANO:  Let's go up.  All right, keep

3   going.  I was looking for the bottom -- keep going.  All

4   right.

5          You're looking at the top part, is that correct,

6   "Hi, Charles"?

7   A.   To Charles, yes.

8   Q.   All right, and from the first paragraph, can you tell

9   me what this pertains to?

10  A.   This is a formal complaint filed by Professor Appel

11  to Charles Alexander who is the judicial officer of

12  Students Affairs.

13  Q.   Who does the first paragraph reference as some of

14  these people that she's complaining about?

15  A.   She's complaining about the students that had gone

16  over to H. R. to complain about --

17  Q.   What name does she mention?

18  A.   Jessica Bock, Cynthia Heslin, Stephanial Hongo and

19  Christina Fey.

20  Q.   Now, this is dated 3/15/07, correct?

21  A.   It is.

22  Q.   And so did this occur before, before you got the

23  letter from the Dean asking you to go to the class?

24  A.   Asking to --

25  Q.   Asking you to go to the class and check and see who

1    wanted alternate instruction?

2    A.    This is after.

3    Q.    This is after you went to the class?

4    A.    Refresh me as to what that date was?  There are so

5    many dates, I can't remember.

6    Q.    All right.

7    A.    I'm thinking it was after.

8    Q.    Would you put up, put up for a moment, please, 549,

9    please?

10                 MR. JORDANO:  Is 549 one of our exhibits?

11                 THE COURT:  Yes, it is.

12   BY MR. JORDANO:

13   Q.    See the date?

14   A.    This is March 30.

15   Q.    All right.  Go back to the last one, if you would?

16   A.    And the other one is the 15th.  And this is the 15th

17   so this obviously occurred before.

18   Q.    So, Ms. Appel files a complaint on 3/15, around that

19   time?

20   A.    Yes.

21   Q.    And later on you get the letter from the Dean, is

22   that correct?

23   A.    Yes.

24   Q.    All right.  Now, in April of, in April of 2007, were

25   you involved in Ms. Appel's professional assessment?

1    A.    I was.

2    Q.    And what was your involvement there?

3    A.    I sat on the Department Evaluation Committee as one

4    of three members who conducted the assessment, the

5    professional assessment.

6    Q.    Go to 558, please.

7          And what is this?  Do you recognize this first page?

8    A.    This, this is the report, professional assessment

9    report submitted by the DEC.

10   Q.    What is the DEC?

11   A.    Department Evaluation Committee.  It's a committee of

12   peers within the department that generate this report

13   based on contractual stipulations.

14   Q.    Slide down in the letter, please, toward the next

15   three pages, please.  Stop.

16         Did this report go through the four areas that the

17   contract calls for in terms of -- excuse me, professional

18   assessment?

19   A.    Yes, it did.

20   Q.    And did Ms. Appel provide information as part of this

21   process?

22   A.    Yes.

23   Q.    Did you consider that?

24   A.    Yes.

25   Q.    All right.  And then the committee issues a report,

1    recommendation?

2    A.    Yes.

3    Q.    All right, go down, please, to overview.

4          Now, there's an overview section, correct?

5    A.    Yes.

6    Q.    You mentioned her syllabi?

7    A.    We did.

8    Q.    Would you go down a little further, please?  Keep

9    going to the conclusion.  Let me stop for a second.

10         Of the four areas, first is load credit, is that

11   correct?

12   A.    Yes.

13   Q.    What is the second?

14   A.    The second area is service to the university and to

15   the, and to the department.  There are four areas.

16   Q.    But are they weighted?  Under the contract, are they

17   weighted?

18   A.    I'm not understanding your question.  Is one more

19   important than the other?

20   Q.    Right?

21   A.    Is that what you're saying?

22   Q.    Yes.

23   A.    They are in order, yes.

24   Q.    So one is load credit?

25   A.    Load credit, professional activity, creative

1    activity.  And I'm not saying them in the order

2    necessarily.

3    Q.   You don't remember the order?

4    A.   I don't recall the order.  I know what they are.

5    Q.   I wanted to know if you remembered the order?

6    A.   Okay.

7    Q.   All right?  Please go down to the final area here,

8    the conclusion.

9         Now, does the DEC discuss at all the special

10   assessment?

11   A.   It does.

12   Q.   Why?

13   A.   It does because the special assessment stated

14   specifically that the DEC in this report would look at

15   syllabi and it would look at interaction with other

16   faculty, staff and students.

17   Q.   That was part of the plan?

18   A.   It was part of the plan for remediation.

19   Q.   Would you put up 566, please?

20        Do you recognize this letter?

21   A.   Yes, I do.  Could you scroll down a little further?

22   But I do recognize it.

23   Q.   Okay.  This is dated July 20th, 2007, right?

24   A.   Yes.

25   Q.   And the author is Dr. Rinker?

1    A.    Yes.

2    Q.    All right.  Now, did you attend any meeting

3    associated with this letter?

4    A.    Yes.

5    Q.    All right.  What was the purpose of the meeting?

6    A.    The purpose of the meeting was to see if we could get

7    Professor Appel to comply to the plan for remediation.

8    Q.    And what was her demeanor and attitude at this

9    meeting?

10   A.    She was not -- she was very displeased.

11   Q.    And did anyone yell at her during this meeting?

12   A.    Nobody yelled at her during this meeting.

13   Q.    How did she treat others?

14   A.    She got extremely upset and spoke over others, would

15   not let others speak, and yelled at people.

16   Q.    Would you scroll down in the letter, please?  Keep

17   going.  Stop there.

18         Now, do you recognize this section of the letter?

19   A.    I do.

20   Q.    Now this is the Dean -- now, does this section

21   pertain to you at all?

22   A.    Yes, it does.

23   Q.    All right, and what -- how does it pertain to you?

24   A.    Well, specifically, it's related to the syllabi

25   because in this letter Provost Rinker has asked or has

1   required Professor Appel to submit to me a syllabus for

2   that course, the one course she'll be teaching that

3   semester, and the following weeks, each week, to submit

4   syllabi for all, all of the courses that she will be

5   teaching in the future so that the issues could be

6   rectified.

7   Q.   And how many classes, how many classes would she

8   normally teach?

9   A.   Normally she would teach two to three classes a

10  semester.

11  Q.   And this semester, how many was she teaching?

12  A.   She was teaching one class.

13  Q.   And was she being paid her full salary?

14  A.   She was going to be paid her full salary and given

15  the time to address the issues that had come out in the

16  plan for remediation, issues of concern.

17  Q.   Any other issue besides syllabi that pertained to

18  you, that involved you?

19  A.   That involved me specifically?  No.

20  Q.   Look at paragraph four.

21  A.   Creative activity.

22  Q.   Yes.

23  A.   Yes, I believe she was supposed to submit a plan for

24  creative activity, a plan for creative activity.

25  Q.   Did the Dean request that you and the Dean do

1    anything in that paragraph?  In that paragraph?

2    A.    Let me see specifically.

3    Q.    Yes, thank you.

4    A.    (Pause)

5         Okay, let me see if I can -- we, Carol Hawkes and I,

6    were to meet with Professor Appel to discuss this plan for

7    creative activity, that she was actually supposed to

8    submit something in writing and then subsequently submit

9    that to Provost Rinker.

10   Q.    And did, during the Fall of 2007, did Ms. Appel

11   submit the syllabi to you?

12   A.    She did not.

13   Q.    Did she submit a written plan for creative activity

14   to you?

15   A.    She did not.

16   Q.    Now, did you have any subsequent meetings after

17   July 20 where you met with Ms. Appel to talk about these

18   requirements?

19   A.    It's my recollection we did meet.

20   Q.    And when was the first -- when was one of those

21   meetings?

22   A.    I couldn't tell you the date.

23   Q.    Well, what month was it in?

24   A.    It was in September.

25   Q.    All right.  And what happened during that meeting?

```
1    A.   During that meeting, Professor Appel stated that her

2    syllabi were fine and that there was nothing wrong with

3    them and that she would no along be working on a

4    syllabi -- and she stated that there were no issues with

5    her creative.

6    Q.   Creative --

7    A.   That there were no issues with her creative

8    endeavors.

9    Q.   All right.  And what was her demeanor like?

10   A.   She was very rude and accusatory and harsh and yelled

11   and talked over people, wouldn't let other people speak.

12   It was very difficult for us to articulate what we were

13   thinking to her.

14   Q.   Did you meet a second time?

15   A.   We met a second time.

16   Q.   When was that, what month?

17   A.   That was September, I think maybe the 13th.

18   Q.   All right.  And what happened during that meeting?

19   A.   During that meeting, she initially, when she came

20   into that meeting, she began to discuss her creative

21   activity.  And I asked her to submit a plan in writing, as

22   stipulated by, by Provost Rinker.

23   Q.   What did she say?

24   A.   To which she responded that she wasn't going to do

25   that, and then we once again tried to discuss with her the
```

1    syllabus issue, and she stated that her syllabus were

2    done, she wasn't doing anything else, and she stormed out

3    of the room.

4    Q.    Did you ever approve any of her syllabi?

5    A.    No.

6    Q.    Now, did Dean Spiridon have any involvement in your

7    review of syllabi?

8    A.    Not in the review -- actual review of syllabi?  No.

9    Q.    Was he involved at all in any of your, your

10   discussions with Ms. Appel about creative activity.

11   A.    No.

12   Q.    Did Dean Vaden-Goad have any involvement in your

13   discussions about syllabi with Ms. Appel?

14   A.    No.

15   Q.    How with -- about creative activity?

16   A.    No.

17   Q.    Did Dean Rinker, was she present for any of these

18   discussions?

19   A.    No.

20   Q.    Who was present with you?  Who was present with you?

21   A.    These meetings were primarily with Carol Hawkes and

22   myself.  There may have been a meeting or two where at our

23   request Charles Spiridon sat in on the meeting.

24   Q.    Did he participate?

25   A.    No, not directly.

1          MR. JORDANO:  May I have one moment, please,

2     Your Honor?

3               (Pause)

4          MR. JORDANO:  Thank you.  Nothing further, Your

5     Honor.

6          THE COURT:  All right.  Cross?

7          MR. WILLIAMS:  Yes, Your Honor.  Thank you.

8     CROSS EXAMINATION

9     BY MR. WILLIAMS:

10    Q.   Before you came to WestConn, were you employed at

11    Connecticut College?

12    A.   I was not.

13    Q.   You had no connection with Connecticut College?

14    A.   I earned a bachelor of arts from Connecticut College.

15    I was a student.

16    Q.   Did you ever file a suit against Connecticut College?

17         MR. JORDANO:  Objection.  Relevancy.

18         THE COURT:  What's the relevance?

19         MR. WILLIAMS:  If he came to WestConn with a

20    history of difficulties, it seems to me that would be

21    relevant.

22         THE COURT:  I'm going to sustain the objection.

23         MR. WILLIAMS:  All right.

24    BY MR. WILLIAMS:

25    Q.   When you started at WestConn, it was on a special

1   appointment, isn't that right?

2   A.   Yes.

3   Q.   And who gave that you special appointment?

4   A.   Who gave me have the special --

5   Q.   Yes, sir.

6   A.   -- appointment?  Vice President Steincraus (ph).

7   Q.   Sir, isn't it a fact that special appointments are

8   now and were then awarded by the Chair of the department?

9   A.   The Chair makes the choice.

10  Q.   And who was the Chair who chose you?

11  A.   The interim Chair, there was an interim Chair.  It

12  was John Wallace.  The Chair at the time was Rosalie

13  Appel.

14  Q.   The person who chose you was Rosalie Appel, isn't

15  that true?

16  A.   Yes.

17  Q.   But you don't want to say it, do you?

18  A.   She wasn't on campus at the time.

19  Q.   Isn't it a fact you owe your job to her?

20        MR. JORDANO:  Objection, relevance.

21        THE COURT:  Yes, it's argumentative.

22        MR. WILLIAMS:  All right.

23  BY MR. WILLIAMS:

24  Q.   And after you had the special appointment that she

25  gave you, that was a one year appointment, wasn't it?

1    A.    It was a one year appointment.

2    Q.    After that, she sponsored you for the tenure track

3    position which you obtained that led you to where you are

4    today, isn't that correct?

5    A.    It was a search committee that was comprised of more

6    than one faculty member.  It was not solely Rosalie Appel.

7    Q.    Did she chair the search committee?

8    A.    I don't recall.

9    Q.    Or at least you don't want to say, right?

10        MR. JORDANO:  Objection.

11   A.    I don't recall.

12   Q.    I see.

13        MR. JORDANO:  It's argumentative.

14   BY MR. WILLIAMS:

15   Q.    Is it not a fact that Professor Appel argued on your

16   behalf to do everything in her power to see that you got

17   that job?

18        MR. JORDANO:  Objection, speculation.

19   BY MR. WILLIAMS:

20   Q.    Don't you know that?  Don't you know that?

21        MR. JORDANO:  Objection.  It's argumentative.

22   Speculation.

23        THE COURT:  Well, it's not argumentative and

24   he's asking if he knows it, so it's not speculative.

25   Overruled.

1    A.    Yes.

2    Q.    Now, sir, you were involved in approving the

3    appointment of David Skora to the position that he was

4    given in August of '04, isn't that right?

5    A.    I did serve on the search committee, yes.

6    Q.    And you signed off on that approving that

7    appointment, isn't that right?

8    A.    I didn't hear the last part of your question.

9    Q.    You signed off on that appointment, isn't that

10   correct?

11   A.    I did.

12   Q.    In fact, showing you Exhibit 118 for identification,

13   does your signature appear on that document?

14   A.    Yes, it does.

15   Q.    All right.

16            MR. WILLIAMS:  It's offered, Your Honor.

17            MR. JORDANO:  Objection, relevancy.

18            THE WITNESS:  I'm sorry?

19            MR. JORDANO:  No.  Objection.

20            THE COURT:  He's objecting.

21            THE WITNESS:  I'm sorry, I didn't hear what he

22   said.

23            THE COURT:  He offered the exhibit.

24            THE WITNESS:  Oh.

25            (Hands Court)

```
 1              MR. JORDANO:  It's not relevant.

 2              THE COURT:  What's the relevance?

 3              MR. WILLIAMS:  Your Honor, it shows, obviously

 4    it confirms his involvement in that process and that was a

 5    part of the contested, the two positions that were

 6    challenged in the, in the Caruso complaint.

 7              MR. JORDANO:  The complaint was a year earlier.

 8    2003 was the meeting, not 2004.  This is irrelevant.

 9              THE COURT:  Well, I'm going to admit 118.  It's

10    potentially relevant.  The jury can give it whatever

11    weight it chooses.  118 is full.

12              (Whereupon Plaintiff's Exhibit 118 was marked

13         full.)

14    BY MR. WILLIAMS:

15    Q.   Now, beside your signature there is some writing.

16    "Discussed department recommendation with Dean Vaden-Goad,

17    7/21/04," is that your handwriting?

18    A.   I'm not looking at the document, sir.

19    Q.   Oh, I apologize, it's not showing up on your screen?

20              THE COURT:  I'm sorry, here you go.  I had the

21    override there.

22              (Pause)

23    BY MR. WILLIAMS:

24    Q.   See that?

25    A.   Yes.
```

1    Q.   Do you recall that meeting?

2    A.   I don't specifically recall that meeting.

3    Q.   And that's Dean Vaden-Goad's signature below yours,

4    is that correct?

5    A.   You'll have to ask Dean Vaden-Goad.

6    Q.   You don't recognize her signature?

7    A.   You'll have to ask her.

8    Q.   That wasn't my question.  My question is you don't

9    recognize her signature?

10   A.   I don't know her signature specifically.

11   Q.   Very good.  Thank you, sir.

12        Now, you were aware, were you not, that in May of

13   2005 there was a hearing conducted before the Commission

14   on Human Rights and Opportunities here in Bridgeport

15   involving Professor Caruso?

16   A.   There was a hearing.  I don't know if that was the

17   date.

18   Q.   Did -- were you present at that hearing --

19        THE COURT:  Mr. Williams, just a moment.  Sir,

20   are you a witness in this case?

21        UNKNOWN:  No, Your Honor.  Assistant Attorney

22   General Niles Davey (ph).

23        THE COURT:  Very good, thank you.

24        UNKNOWN:  Thank you.

25

BY MR. WILLIAMS:

Q.   Were you present for any part of that hearing?

A.   At one point I was.  I don't know whether it was one hearing, two hearings, three hearings.  One part of the hearing, I was there.

Q.   And you were aware that Professor Appel was one of the witnesses on behalf of Professor Caruso, were you not?

A.   At the time I was not.

Q.   I see.  Sir, in Exhibit 509, which is your petition which you wrote and circulated among the members of your department?

A.   Yes.

Q.   You included a number of documents which you had created at various times during the calendar year 2004, is that right?

A.   Yes.

Q.   And those were memos, essentially memos to yourself that you had written from time to time concerning Professor Appel, is that right?

A.   Yes.

Q.   And at the time that you wrote those memos to yourself criticizing her in various ways, you did not at any point communicate anything that you had in those memos to yourself, to the administration, isn't that right?

A.   Yeah, I was not criticizing.

1    Q.    I see.  Well --

2    A.    What I was doing was making a record of events that

3    took place that were disturbing to me.

4    Q.    Right, events involving Professor Appel?

5    A.    Yes.

6    Q.    And those events, according to your, according to

7    your own memos, and I won't put them all up on the screen

8    because you've done it before, but there were a number of

9    different dates that you wrote memos to yourself saying

10   Rosalie did whatever and so forth, correct?

11   A.    Yes.

12   Q.    And you did nothing with those until you prepared

13   this petition, correct?

14   A.    Yes.

15   Q.    Which was on the first of September 2005, correct?

16   A.    That's when the petition was completed and I believe

17   signed.  I worked on a petition prior to that.

18   Q.    During what period of time were you working on the

19   petition?

20   A.    During the Spring, end of the Spring of that last

21   semester, over the course of the Summer.

22   Q.    During the Summer, end of the Spring and the Summer?

23   A.    Yes.

24   Q.    Immediately after Professor Appel had testified at

25   the CHRO, correct?

1    A.   I didn't know she had testified.

2    Q.   I see.

3              MR. WILLIAMS:  No further questions.

4              THE COURT:  Redirect?

5    REDIRECT EXAMINATION

6    BY MR. JORDANO:

7    Q.   During the, during the -- all these memos dealing

8    with here, do they deal with the year when you were Chair,

9    the first year?

10   A.   They had to do with incidents that took place the

11   first year when I was Chair.

12   Q.   And did you speak to Dean Vaden-Goad at all about the

13   specific problems you were having?

14   A.   I did express concern.

15   Q.   So I'm clear for the moment, do you recall the

16   meeting in 2003 when Ms. Appel came back from sabbatical?

17   The first day when she came back from sabbatical?

18             MR. WILLIAMS:  Objection.

19             MR. JORDANO:  Well, it goes to --

20             THE COURT:  Okay.  You need to stand when you

21   object.

22             MR. WILLIAMS:  That's a bad habit I have, Your

23   Honor.  I apologize.

24             THE COURT:  The objection is it's beyond the

25   scope.

1          MR. JORDANO:  I'm going to discuss -- it relates

2     to this exhibit.

3          THE COURT:  Okay.  All right.

4     BY MR. JORDANO:

5     Q.   There's -- do you remember the 2003 faculty meeting

6     when Ms. Appel came back from sabbatical?

7     A.   The September '03 meeting?

8     Q.   '03.

9     A.   September 21st, '03?  Yes, I do.

10    Q.   And were positions discussed to place people?

11    A.   Okay, I see.  Yes, when we discussed the search.

12    Q.   That was in '03.

13    A.   In the lines?  Yes.

14    Q.   And Mr. Skora, what was his initial appointment?

15    A.   It was a one year special appointment.

16    Q.   '03 to when?

17    A.   '04.

18    Q.   And then he was hired in '04, according to Exhibit

19    118, he got the tenure appointment in '04, is that

20    correct?

21    A.   Yes, pursuant to a national search.

22    Q.   Did Dean Spiridon have any involvement in you writing

23    the petition?

24    A.   No, none at all.

25    Q.   Did Dean Vaden-Goad have any involvement in you

1   putting together the petition talking to the people in

2   your department?

3   A.   Not at all, no.

4   Q.   Vice president Rinker, Provost Rinker, was she even

5   at the University?

6   A.   No.

7           MR. JORDANO:  Nothing further.

8           MR. WILLIAMS:  Nothing further.

9           THE COURT:  Sir, you're excused.  Don't discuss

10  your testimony with anyone who may be a witness in this

11  case.

12          THE WITNESS:  Thank you.

13          THE COURT:  Thank you.

14          (Witness excused.)

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


          I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.




          /S/ Susan E. Catucci
          _____

               Susan E. Catucci, RMR
               Official Court Reporter
               915 Lafayette Boulevard
          Bridgeport, Connecticut  06604
               Tel: (917) 703-0761